# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPRINGBOK SERVICES, INC., | ) Case No. 10-25285-HRT |
| EIN: 20-3400089 | ) |
| | ) |
| Debtor. | ) |
| | ) |

## APPLICATION FOR ORDER AUTHORIZING THE EMPLOYMENT OF JAS FINANCIAL SERVICES, LLC, AS RESTRUCTURING ADVISOR FOR DEBTOR

Springbok Services, Inc. ("Springbok" or "Debtor"), pursuant to Fed. R. Bankr. P. 2014(a) and 11 U.S.C. §§ 327(a) and 1107, hereby moves this Court for entry of an order authorizing the employment of JAS Financial Services, LLC and its principal, James A. Skelton (collectively, "JAS"), as Restructuring Advisor for Debtor (the "Motion").

In support thereof, Debtor states the following:

1. On June 18, 2010 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. No creditors' or other committee has been formed and Debtor continues in possession of its assets as a debtor in possession under 11 U.S.C. §§ 1107 and 1108.

2. Debtor operates a vertically-integrated business of pre-paid cards. During its corporate life, over 6,000 clients have purchased Springbok's solutions, including 225 in the Fortune 500.

3. Debtor desires to employ JAS as its restructuring advisor and JAS has agreed to serve as such advisor to Debtor in this case. JAS maintains its office at 930 Skyline Terrace, Laguna Beach, California 92651.

4. JAS' Managing Member, James A. Skelton ("Skelton"), is a turnaround specialist with over thirty years of experience as a turnaround manager and management consultant, providing leadership and/or management for underperforming companies desirous of change. Skelton has been engaged by parties in several other Chapter 11 bankruptcy cases including Frederick's of Hollywood, Video Update, Dialpad and Shoe Pavilion, among others. Mr. Skelton's Curriculum Vitae is attached hereto as **Exhibit 1.**

**Professional Services to be Rendered**

5. On January 25, 2010, Debtor and JAS entered into an Engagement Letter (the "Engagement"), which sets for the services that JAS will render to Debtor. A copy of the

00124266-3

Engagement is attached as **Exhibit 2**. JAS first performed services for the Debtor on or about January 25, 2010. Since that time and up to the Petition Date, the professional services performed by JAS included:

    a.    Full operational and financial control and management of the Company;

    b.    Directing the current managers, officers and employees as to the operations of the Company;

    c.    Serving as the principal contact with Debtor's Lenders and creditors, and provide assistance in discussions with other creditors and stakeholders with respect to the Company's financial and operational matters, including the Company's actual versus budgeted performance for any cash budget that may have been developed by the Company and approved by the Lenders;

    d.    Requesting advances from the Lenders on financial terms determined to be appropriate by JAS;

    e.    Entering into forbearance, loan modification, additional advances, or other agreements with the Lenders; provided that (i) all cash flow projections and other budgets shall be submitted to the Board of Directors for its review prior to or concurrently with delivery thereof to the Lender, (ii) the Board of Directors shall be given advance notice of all modifications to the financing documents and other agreements with the Lender before such modifications become binding on the Company, and (iii) keep the Board of Directors generally informed as to the strategic alternatives JAS is considering and the progress relating thereto and as to the material developments in the Company's business;

    f.    Assisting in the identification of liquidity management and improvement measures, cost controls and expenditure management and other operational and financial management activities and controls while the Company pursues efforts to sell a portion of its asset base to repay debt or in the event that an asset sale is not concluded, as may be acceptable to the Company and JAS;

    g.    Providing the Lenders and their financial advisors with full access to the Company's books, records, and financial information; and

    h.    Performing such other services as requested or directed by the Board of Directors and agreed to by JAS.

    i.    Performing such other analyses, and providing such other advice in connection with Debtor's financial affairs, the conduct of the bankruptcy and the structure and funding of any proposed plan of reorganization as may be requested by Debtor's counsel.

6.    During the course of the Bankruptcy Case, it is expected that JAS will continue to provide full time management of the Company including without limitation full operational and financial control of the Company and act as primary liaison between Debtor and its creditors and

other stakeholders and parties in interest. In connection with Debtor's operations, JAS will ensure that Debtor operates within the budget agreed to with the DIP lender. Also, JAS will manage the process of offering the going-concern operations and assets to interested buyers, including managing due diligence and negations with interested parties. Finally, JAS shall assist in the orderly transition of the services it provides to its sponsoring banks to third party servicers as may be required and as may be agreed between such banks and Debtor, as well as other business needs that arise in the course of the Chapter 11 and the wind up of the Debtor's continuing operations.

**JAS' Fee Arrangements**

    **A.**    **Flat Fee.**

7. The Engagement sets forth that JAS will earn $20,000.00 per week for his full-time employment to the matters for which he is engaged. Debtor will also reimburse JAS for its reasonable out of pocket expenses, including coach class airfare, lodging and meals. Given the full time nature of the JAS' services, JAS will not keep track of his time and shall invoice Debtor as provided for in the Engagement.

8. As of the date hereof, JAS has received the amount of $480,000.00 in the form of retainers (the "Retainer"). Specifically, JAS has received the following retainers on the dated indicated:

| | |
|---|---|
| 2/19/2010 | $ 75,000.00 |
| 2/19/2010 | $ 65,000.00 |
| 3/30/2010 | $ 75,000.00 |
| 3/31/2010 | $ 75,000.00 |
| 5/4/2010 | $ 40,000.00 |
| 5/21/2010 | $ 30,000.00 |
| 5/28/2010 | $ 40,000.00 |
| 6/11/2010 | $ 40,000.00 |
| 6/14/2010 | $ 40,000.00 |

9. Through the Petition Date, JAS has applied the sum of $420,000.00 to the Retainer leaving a balance of $60,000.00 (the "Remaining Retainer").

    **B.**    **Success Fee.**

10. The Engagement further provides that JAS is entitled to a success fee in the minimum amount of $200,000.00 (the "Success Fee"). At this time, it is not likely that a transaction generating the Success Fee will occur and thus, Debtor, with the consent of JAS, does not seek approval of the Success Fee at this time. However, should events occur in the future justifying paying the Success Fee, Debtor will seek approval of the Success Fee at that time.

C. **Connections with Debtor and Other Parties**

11. JAS meets the "disinterested person" standard required by 11 U.S.C. § 327. *See In re Rabex Amuru of North Carolina, Inc.,* 198 B.R. 892 (Bankr. M.D.N.C.1996); *In re Lotus Properties LP,* 200 B.R. 388 (Bankr. C.D. Cal. 1996).

12. No promises have been received by JAS or by any shareholders, counsel or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

13. JAS has reviewed the list of creditors filed by Debtor. JAS and Debtor are unaware of any connections between JAS and Debtor, its creditors, other parties in interest, or their respective attorneys and accountants.

14. JAS (i) does not represent or hold any interest adverse to Debtor or the estate in the matters upon which it is to be employed or in any other matters, (ii) does not have any connections to Debtor, creditors or any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee, other than as disclosed above, and (iii) is a disinterested person within the meaning of 11 U.S.C. § 101.

15. Filed contemporaneously herewith and attached hereto as **Exhibit 3** is the Verified Statement of James A. Skelton (A) Pursuant to Fed. R. Bankr. P. 2014(a), and (B) In Support of Application for Order Authorizing the Employment of JAS Financial Services, LLC, as Restructuring Advisor for the Debtor.

16. No committee of creditors has been appointed or designated herein. This Motion was served upon the United States Trustee, Debtor's top twenty creditors and Debtor's lenders.

WHEREFORE, pursuant to 11 U.S.C. §§ 327(a) and 1107, Debtor requests that it be (1) authorized to employ James A. Skelton and JAS Financial Services, LLC, to advise them in this bankruptcy case and related proceedings, *nunc pro tunc* as of the date hereof, (2) approve the Engagement and the terms contained therein excluding the Success Fee, and (3) for such other and further relief as the Court deems proper.

Dated: June 22, 2010.    BIEGING SHAPIRO & BURRUS, LLP

By: /s/ Duncan E. Barber
Duncan E. Barber, #16768
Steven T. Mulligan, #19901
4582 S Ulster Street Pkwy, Ste. 1650
Denver, Colorado 80237
Tel: (720) 488-0220; Fax: (720) 488-7711
Email: dbarber@bsblawyers.com
Email: smulligan@bsblawyers.com
Proposed Counsel for Springbok Services, Inc.

**JAMES A. SKELTON**
930 Skyline Terrace
Laguna Beach, CA 92651
Office: (949)-464-9170
Fax:    (949)-464-9180
Cell:   (949)-466-7303
*jaskelton@att.net*

## CAREER SUMMARY

Seasoned executive with 30 year track record of experience in creating value for stakeholders in underperforming, turnaround and rapid growth situations in a broad range of industries, including manufacturing, distribution, retail, apparel, construction, technology, healthcare, licensing, financial and business services. Areas of expertise include:

- Business turnaround management leadership
- Business plan development and implementation
- Purchase and sale of distressed businesses
- Managing integration of acquired businesses

- Bankruptcy process management
- Restructuring of complex financial investments
- Private equity investment
- Financing placements and transaction negotiation

## PROFESSIONAL EXPERIENCE

**JAS FINANCIAL SERVICES, LLC, Laguna Beach, CA**                       December 2001 to Present
**Managing Member**

Independent management and advisory firm specializing in creating and enhancing value for stakeholders in underperforming, undervalued or rapidly growing companies, by providing experienced interim management and financial advisory services. Representative engagements included:

- **Springbok Services, Inc., Englewood, CO**                           February 2010 - Present
  Serving as financial advisor for this leading vertically integrated prepaid MasterCard and Visa solutions provider.
- **Fluid Ink Technologies, Inc., Moorpark, CA**                        November 2009 to April 2010
  Served as **Chief Restructuring Officer** of this $30 million Chinese majority owned specialty ink producer with facilities in California and New Jersey. Completed successful transaction with strategic Japanese public company.
- **Conquist America, Santa Ana, CA**                                   September 2009 to Present
  Serving as financial advisor for this leading mortgage banking company serving the Hispanic community in Southern California, seeking to raise new capital in a change of control transaction.
- **Westcliff Medical Laboratories, Inc., Santa Ana, CA**               March 2009 to July 2009
  Served as the Board Designated Independent Professional and **Chief Restructuring Officer** for this leading $100 million private equity backed medical diagnostic testing lab company. Provided process leadership for the operational restructuring and pursuit of strategic alternatives leading to a change of control balance sheet restructuring.
- **Plasmon, Inc., Colorado Springs, CO**                               November 2008 to February 2009
  Provided interim management and on-site leadership under a court appointed receivership, leading to the successful sale of substantially all of the assets and intellectual property of this leading data archiving technology company to a strategic buyer pursuant to an Article 9 foreclosure sale, resulting in a complete recovery to the secured creditors.
- **Eurodesign Cabinets, Inc., Chino, CA**                              October 2005 to May 2007
  Served as **President & CEO** leading the operational restructuring and return to profitability of $60 million private equity backed manufacturer and installer of kitchen and bathroom cabinets serving the major national and regional residential homebuilders in northern and southern California.
- **M-Wave, Inc. (NASDAQ: MWAV), West Chicago, IL**                     May 2004 to September 2005
  Served as a member of the **Board of Directors**, also providing financial and M&A advisory services to CEO, including private placement of $6 million PIPE investment and the subsequent development and on-going execution of strategic growth and merger and acquisition plans, for this Asian sourcing supply chain service distributor of electronic components.
- **Outsourcing Services Group, Inc., Woodcliff Lake, NJ**              January 2003 to May 2004
  Served as **President & Chief Restructuring Officer** leading the operational turnaround and ultimate out-of-court balance sheet restructuring of this $350 million private equity backed contract filling and packaging company providing outsourced services to the leading branded marketers in the household, health and beauty care, color cosmetics and pharmaceuticals industries from nine plant locations in the U.S., Canada and Mexico.

EXHIBIT 1

- **Powerplant Maintenance Specialists, Inc., Costa Mesa, CA**  March 2002 to December 2002
  Provided bankruptcy process management and reporting services to Debtors counsel, LeBoeuf, Lamb, Greene & McRae, during this Chapter 11 case in the Central District of California.
- **Finova Mayo Holdings, LLC, Honolulu, HI**  March 2002 to September 2002
  Served as interim **CEO** during the Article 9 foreclosure process and positioning for recovery and sale of this chain of tire and automotive service stores dba Lex Brodie's Tire Company.
- **Dialpad, Inc., Santa Clara, CA**  December 2001 to March 2002
  Provided bankruptcy process management and reporting services, and lead the negotiation of the ultimate sale of substantially all of the assets of this leading voice over internet services provider (VOIP) pursuant to Section 363 (b) of the bankruptcy code

## FOCALPOINT PARTNERS, LLC, Los Angeles, CA  June 2007 to January 2009
**Managing Director**
Head of restructuring practice in boutique investment banking firm. Significant cases included:
- **Shoe Pavilion, Inc., Sherman Oaks, CA**  July 2008 to December 2008
  Served as financial advisors to the Debtor, leading the operational and financial restructuring, including closing underperforming stores and negotiating lease concessions, leading to the orderly liquidation of substantially all of the assets of this 115 store, in order to maximize the recovery for the benefit of the creditors.
- **SmartMove Auto, Inc., Atlanta, GA**  June 2008 to November 2008
  Served as financial restructuring advisor to this leading chain of sub-prime used car sales and finance operations serving the Georgia, Colorado and Nevada markets employing a "buy here, pay here" model.
- **Care Level Management Group, Woodland Hills, CA**  January 2008 to July 2008
  Served as financial advisor to this home healthcare provider, leading the restructuring of their operations and balance sheet after the loss of their largest customer resulted in a decline in revenue of 70%. Successfully sold the going concern operations through a Chapter 11 Sec. 353 sale process.
- **Big A Drugstores, Northgate, CA**  July 2007 to October 2007
  Served as pre-petition financial advisor in preparation for the liquidating Chapter 11 for this chain of retail pharmacies operating as Drug Emporium, Drug Barn and Big A Drugs.

## CROSSROADS, LLC, Newport Beach, CA  June 1997 to November 2001
**Founding Principal**
Crossroads is a nationally recognized turnaround management and restructuring advisory firm. While attempting to raise the Newport Restructuring Fund, L.P., Mr. Skelton lead the direct private equity investment by Crossroads and affiliates in **Centura Software, Inc. (NASDAQ: CNTR)** which was named one of the Top 10 turnaround investments in 1999 by "Turnarounds & Workouts" magazine, yielding greater than a 10x equity return.
Other notable management engagements included:
- **Video Update, Inc. (NASDAQ: VUPDA), Minneapolis, MN**  December 2000 to November 2001
  Served as court appointed **Chief Restructuring Officer** and subsequently as interim **CEO** during the Chapter 11 proceeding of this chain of 400+ video rental retail stores in the US and Canada. Negotiated the sale of the senior bank debt to Movie Gallery, Inc. (NASDAQ: MOVI) that lead to the confirmation of a consensual Plan of Reorganization.
- **Frederick's of Hollywood, Inc., Hollywood, CA**  May 2000 to November 2000
  Served as the **Chief Restructuring Officer** leading up to and during the Chapter 11 reorganization of this $150 million intimate apparel retailer with 200 stores in 40 states, the legendary Frederick's of Hollywood catalog and the Frederick's.com e-commerce site. Arranged for and negotiated debtor-in-possession financing, analyzed individual store performance for closures, and managed all operating costs and cash flow within established budgets. Company successfully emerged from bankruptcy by confirming its Plan of Reorganization.

## BERKELEY INTERNATIONAL CAPITAL, San Francisco, CA  January 1995 to May 1997
**Senior Vice President & Division Manager**
Berkeley was the investment management group for London Pacific Life & Annuity, with active portfolios of middle market mezzanine investments and control equity turnaround investments. Mr. Skelton served as the manager of the Turnaround Investment Division and its portfolio of control equity investments and also actively managed the workout

and recovery efforts on a portfolio of over $300 million in impaired mezzanine debt investments. Among his notable direct portfolio management assignments were the following:

- **Ocean Pacific Apparel Corp., Irvine, CA**　　　　　　　　　　　　　　　　　January 1995 to May 1997
  Participated in the acquisition of this branded lifestyle apparel company out of bankruptcy and subsequently lead the operational restructuring from a money losing domestic manufacturer and distributor, to a profitable international licensor and Asian sourcing operation. Served as **Chairman of the Board** and as **CEO** from January 1996 to May 1997. Positioned company for sale to a private equity group yielding a 5x equity return.
- **Catalina Furniture Co. Inc., La Mirada, CA**　　　　　　　　　　　　　　　January 1995 to May 1997
  Served as a member of the **Board of Directors** and interim **CEO** of this leading manufacturer of wood bedroom furniture. Actively lead the refinancing of the company's senior and subordinated debt facilities, resulting in increased borrowing availability on improved terms. Served on special committee of the Board developing strategies for expanding production capacity in Mexico and reducing overall cost structure, leading to return to profitability.
- **Two Count Company, Inc., Oakland, CA**　　　　　　　　　　　　　　　January 1995 to December 1996
  Served as a member of the **Board of Directors** and interim **CEO** of this distributor of frozen foods, ice cream and novelties. Actively lead the development of new strategic alliance to replace lost volume.
- **Gruen Marketing Corporation, Wilkes Barre, PA**　　　　　　　　　　　　　June 1996 to May 1997
  Appointed **Chairman of the Board** and **CEO** upon the default on senior and mezzanine debt and turnover of equity control from Charterhouse Group of this designer and importer of Asian sourced fashion watches. Managed operational cost restructuring and cash flow while positioning company for successful sale to competitor, M.Z. Berger.
- **Display & Visual Merchandising, Inc., Newark, NJ & Carson, CA**　　　　November 1996 to May 1997
  Served as member of the **Board of Directors** and special committee to assess operational cost restructuring opportunities and sale of underperforming division.

## HELLER FINANCIAL, INC., Chicago, IL　　　　　　　　　　　　　　　　　　January 1990 to December 1994

### Heller Investments, Inc., San Francisco, CA　　　　　　　　　　　　　　　January 1993 to December 1994
**Western Region Managing Director**
Started up Western region office for this private equity turnaround investment division of Heller. Responsible for recruiting staff professionals, marketing and sourcing of investment opportunities, due diligence, negotiations, structuring, financing and closing of transactions. Actively managed operational turnarounds and strategic growth plans for investment portfolio companies.

### Heller Equity Capital Corp., Chicago, IL　　　　　　　　　　　　　　　　　January 1990 to December 1992
**Senior Vice President and Principal**
Recruited as one of the founding Principals of the Turnaround Investment Division of this SBIC division of Heller. Responsible for sourcing, due diligence, underwriting, structuring, negotiation, financing and closing of control equity investment transactions resulting in the investment of $50 million in equity in 5 portfolio companies that ultimately yielded a 38 % IRR over a five year investment period. Actively managed the operational turnarounds and strategic development of portfolio companies while serving on the **Board of Directors** of:

- **Kroy, Inc.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　1990-1994
- **Harter Group**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　1991-1994
- **United Fixtures, Inc.**　　　　　　　　　　　　　　　　　　　　　　　　　　1991-1994

## MORRIS-ANDERSON & ASSOCIATES, INC., Glenview, IL　　　　　　　　January 1986 to December 1989
**Partner**
Morris-Anderson was a nationally recognized turnaround and crisis management firm. After merging his independent consulting practice into Morris-Anderson, Mr. Skelton was responsible for marketing the firm's services to bank workout officers, private equity investors and law firms. He directly managed the operational revitalization and financial restructuring of numerous middle market companies in the manufacturing, distribution, retail, apparel, construction and business services industries, often while serving in the role of interim CEO or COO.

**JAS FINANCIAL SERVICES,** Lake Forest, IL                January 1983 to December 1985
Principal/Owner
Continued independent consulting practice acquired from Ross-Payne & Associates. Provided strategic and financial advisory services to owners/entrepreneurs, primarily in the construction and related material distribution industries. Conducted a series of management and financial seminars sponsored by leading industry trade associations. Merged practice and client base into Morris-Anderson & Associates.

**ROSS-PAYNE & ASSOCIATES,** Barrington, IL                June 1980 to December 1982
Partner

Recruited out of business school to join this boutique construction industry consulting and management training firm. Subsequently acquired individual client base.

## EDUCATION

**Cornell University, Johnson Graduate School of Business**
- MBA – May 1980
- Concentration in Finance and Economics

**The Ohio State University**
- B.S. – December, 1977

## AFFILIATIONS

**Turnaround Management Association**
- Founding Director – Chicago Chapter (1990-1993)
- Founding Director – Northern California Chapter (1994-1997)

**Institute of Management Consultants**
- Certified Management Consultant (CMC) – 1984

**Association for Corporate Growth**

**Frequent Speaker and Panelist for Industry Conferences**
- Beard Group/Renaissance American Management "Distressed Investing" Conference Co-Chair (1998-2000)

*Personal & Professional References Available Upon Request*

# JAS Financial Services, LLC
930 Skyline Terrace
Laguna Beach, CA 92651
(949)-464-9170 (Off)
(949)-466-7303 (Cell)
jaskelton@att.net

January 25, 2010

**SPRINGBOK SERVICES, INC.**
345 Inverness Drive South
Building C, Suite 300
Englewood, CO 80112
Attn: Taylor Ohlsen
  CEO


**Re: Restructuring Advisory Engagement**

Dear Mr. Ohlsen:

Pursuant to our discussions, JAS Financial Services, LLC ("**JAS**") hereby agrees to provide the services of its Managing Member, James A. Skelton ("**Skelton**") to serve as an experienced advisor to Springbok Services, Inc. (the "**Company**") at the request of the Boards of Directors of the Company (the "**Board**"), on the terms and conditions set forth herein.


**Services and Authority**

Under this Agreement, JAS will provide its independent turnaround management and operational and financial restructuring process management services to the Company as more fully set forth below. Such services will be provided during the initial 6-8 week assessment period of the engagement on a basis of not less than 3-4 days per week on site at the Company. This time commitment may be modified thereafter by mutual agreement.

During the term of this Agreement, JAS will provide the services and is granted the powers and authorities specified below subject in each case to compliance with the Company's Certificate of Incorporation and other corporate documents entered into at the time of the Goldman-Sachs investment, the express limitations set forth below and any authority reserved to the Board.

1. Independently review and assess the Company's current financial position and projected operating and financial performance and cash flow requirements, and take appropriate steps on behalf of the Company to maximize the value of the Company's assets and business.
2. Coordinate and communicate with the Company's stakeholders and respective officers and advisors to provide process leadership towards the development of strategic alternatives leading to the successful operational and financial restructuring of the Company and the completion of potential future transactions in the form of a debt or equity investment; a sale of all or substantially all of the assets or the majority of the outstanding equity in the Company; or a restructuring transaction involving the discounting, extinguishment or conversion of debt resulting in a change of equity control in the Company (each, a "**Transaction**").
3. Provide regular effective communication of all activities, business developments, process status and updates of cash flow forecasts and requirements and other financial projections to all Company stakeholders, as appropriate.



4. JAS shall take immediate steps to develop a strategy for dealing with the Company's operational performance improvement and financial restructuring and shall advise the Company's management team and provide direct hands on leadership of the execution of operational improvement initiatives and strategic changes in business processes and policies to most effectively position the Company and maximize its value going forward.
5. JAS is authorized to take any actions on behalf of the Company, without the need for any further action on behalf of or approval by the Board, if JAS determines that doing so is in the best interests of the Company, including doing any of the following: (a) requesting advances from Key Bank, The Bancorp Bank and Lois LeMenager (the "**Lenders**"), on financial terms determined to be appropriate by JAS, and (b) entering into forbearance, loan modification, additional advances, or other agreements with the Lenders; provided that (i) all cash flow projections and other budgets shall be submitted to the Board for its review prior to or concurrently with delivery thereof to the Lender, (ii) the Board shall be given advance notice of all modifications to the financing documents and other agreements with the Lender before such modifications become binding on the Company, and (iii) keep the Board generally informed as to the strategic alternatives JAS is considering and the progress relating thereto and as to the material developments in the Company's business. JAS understands that the Board shall retain the sole authority to authorize (i) the binding of the Company or any of its subsidiaries to any sale transactions and (ii) the commencement of any insolvency proceedings, the confession or consent to any judgment in favor of a holder of material indebtedness, the turning over of assets through a foreclosure procedure or process, assignment in lieu of foreclosure, assignment for the benefit of creditors or similar action, or consent to receivership, in each case, by the Company. JAS also understands that the approval of the Board shall be required with respect to any actions by JAS which purport to bind the Company or any of its subsidiaries to any of the matters referenced in the previous sentence.
6. JAS is authorized to communicate directly with the Lenders and other stakeholders and their respective professional advisors.
7. Subject to prior approval of Company's management in each case, JAS shall provide the Lenders and their financial advisors with full access to the Company's books, records, and financial information.
8. JAS is authorized and directed to consult with the Lenders before taking any strategic action with respect to the Company' restructuring alternatives. The obligation is one of good faith consultation only. JAS shall not take instructions from the Lenders and shall use its independent professional judgment in determining what steps to take on behalf of the Company.

**Compensation**

In consideration for performing its services hereunder, Company will compensate JAS as follows:

1. Upon the execution of this Agreement, JAS shall receive a non-refundable retainer of $50,000. This retainer shall be applied against the Transaction Success Fee described below.
2. During the initial term of this Agreement (as defined below), JAS shall earn a fixed fee of $75,000 for the first complete month (January 25, 2010 to February 19, 2010), $15,000 for the period from February 20, 2010 to February 28, 2010, $75,000 for the period from March 1, 2010 through March 31, 2010, plus a fixed monthly fee of $75,000 or weekly fee of $20,000 per week thereafter. Payment for each month or week shall be made in advance no later than the last business day of the previous month or week, as applicable. On the effective date of this Agreement, in addition to the retainer described above, JAS shall be paid the fee for the first month of the engagement.

Springbok Services, Inc.
January 25, 2010
Page 3 of 6

3. After the initial term of this Agreement, or in the event that the scope and time requirements to deliver the services is determined to be less than 4 days per week on site at the Company, JAS and the Company may mutually agree to modify the compensation terms to an hourly or daily rate of $500/hour or $4,000/day.
4. JAS shall also be entitled to reimbursement of reasonable out of pocket expenses, including coach class airfare, lodging and meals. Reimbursement of expenses shall be made on a weekly basis upon presentation of invoices to the Company by JAS.
5. Upon the termination of the engagement due to the successful completion of a Transaction, subject to a minimum Transaction Success Fee of $200,000, JAS shall be entitled to receive a Transaction Success Fee equal to the following:

   (a) If the Transaction involves additional capital being paid into the Company ("**New Money**") and the source of the New Money is secured primarily through the efforts of JAS, then Company shall pay JAS an amount equal to **2.00%** of the Transaction Value.

   (b) If the Transaction involves (i) New Money and the source of the New Money arises from a source other than as described in Section 5(a), or (ii) the discounting, extinguishment or conversion of debt resulting in a change of equity control in the Company (each, a "**Debt Reduction**"), or (iii) any combination of Clause (i) or (ii) above and the Transaction Value is less than **$25 million**, then Company shall pay JAS an amount equal to **1.00%** of the Transaction Value.

   (c) If the Transaction involves (i) New Money and the source of the New Money arises from a source other than as described in Section 5(a), or (ii) Debt Reduction, or (iii) any combination of Clause (i) or (ii) above and the Transaction Value is greater than or equal to **$25 million**, then Company shall pay JAS an amount equal to **1.00%** for the first **$25 million** in Transaction Value and **3.00%** for the amount of any Transaction Value in excess of **$25 million**.

For purposes of this Agreement, the term "**Transaction Value**" shall mean the total amount of (i) cash paid or payable; plus (ii) the fair market value on the date of payment of all securities and other property paid or payable, directly or indirectly, by the acquiring party (the "**Acquiror**") to the Company or to the Company's contract parties, claim holders, security holders and employees; plus (iii) any liabilities assumed by the Acquiror in connection with the Transaction; plus (iv) the amount of any permanent Debt Reduction. For example, if JAS negotiates with the Company's largest creditors to permanently reduce the amount of outstanding debt from $28 million to $10 million and an investor agrees to pay $20 million for all of the outstanding stock of the Company following such Debt Reduction, then the Transaction Value would be $38 million ($18 million debt reduction + $10 million debt assumption + $10 million New Money). In the event that the Company elects to pursue a Sale through a Chapter 11 plan of reorganization, an asset sale in Chapter 11 pursuant to Section 363 of the Bankruptcy Code, or recapitalization, whether through private negotiation with its bank(s) and/or other creditors or other judicial process, the Transaction Success Fee payable to JAS shall be determined in the manner described above. All payments described in Section 5 above shall be made as consideration is received by the Company. For example, if a portion of the consideration is paid in an earn out over a period of years, the payment described in Section 5 will be paid ratably over the period of the earn out as consideration is received by the Company.

Any dispute regarding the Transaction Value or the amount of the Transaction Success Fee shall be settled by final and binding arbitration in Denver, Colorado in accordance with the commercial rules then prevailing of the American Arbitration Association by a panel of three (3) arbitrators appointed by the American Arbitration Association. The decision of the arbitrators shall be binding on JAS and the

Springbok Services, Inc.
January 25, 2010

Page 4 of 6

Company and may be entered and enforced in any court of competent jurisdiction by either party. The arbitration shall be pursued and brought to conclusion as rapidly as is possible.

**Term**

The term of this Agreement shall, except as otherwise provided herein, run for an initial period ending on March 31, 2010. At the end of the initial period, the term shall be automatically extended on a week-to-week basis or modified to a daily or hourly basis, thereafter until terminated by either JAS or the Company in writing with not less than 14 days prior notice.

Notwithstanding any expiration or termination of this Agreement (other than a termination by JAS when Company is still requesting JAS' services hereunder), JAS shall be compensated in the manner described in Section 5 under the heading **"Compensation"** if a Transaction is agreed upon or consummated within six months following the date of such expiration or termination.

**Confidentiality**

The Company will furnish or cause to be furnished to JAS such information as JAS believes appropriate to its assignment (all such information so furnished being the **"Confidential Information"**). JAS will handle the Confidential Information in strict confidence in accordance with the Mutual Non-Disclosure Agreement which was executed by the Parties and is effective as of the date of this Agreement (the **"Mutual NDA"**).

Except as required by applicable law or contemplated by the terms hereof, any advice to be provided by JAS under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's professional advisors including, without limitation, lawyers, accountants and investment bankers) without the prior written consent of JAS. All services, advice and information and reports provided by JAS to the Company in connection with this assignment shall be for the sole benefit of the Company and its stakeholders.

**Indemnification**

The Company acknowledges and agrees that JAS has been retained to act solely as an independent financial advisor to the Company. In such capacity, JAS shall act as an independent contractor, and any duties of JAS arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. A copy of JAS's standard form of indemnification agreement is attached to this Agreement as Attachment A.

Springbok Services, Inc.
January 25, 2010

Page 5 of 6

### Bankruptcy

In the event the Company becomes a Debtor under Chapter 11 of the Bankruptcy Code, the Company shall use its best efforts to file an application (the "**JAS Employment Application**") with the Bankruptcy Court to employ JAS in accordance with the terms of this Agreement pursuant to Section 328 of the Bankruptcy Code, and to assume this Agreement. The Company will cause the JAS Employment Application to be filed promptly (and in any event within five business days) following the commencement of the Company's Chapter 11 bankruptcy case and to seek to obtain Bankruptcy Court approval of the JAS Employment Application on an expedited basis. The Company shall supply JAS with a draft of the JAS Employment Application sufficiently in advance of the filing of the JAS Employment Application with the Bankruptcy Court to enable JAS and its counsel to review and comment thereon. JAS shall have no obligation to provide any services under this Agreement in the event that the Company becomes a Chapter 11 debtor unless and until the Company's retention of JAS in accordance with the terms of this Agreement is approved by a Bankruptcy Court order. In the context of any such Chapter 11 bankruptcy case involving the Company, the scope of services to be provided by JAS to the Company shall include providing any testimony (either in the Bankruptcy Court or in deposition) as needed to assist the Company to effectuate a transaction or otherwise.

JAS acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, JAS's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court. In the event that the Company becomes a Chapter 11 debtor and the Company's employment of JAS is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of JAS in accordance with the terms of this Agreement as promptly as practicable in accordance with the terms hereof. In the event the Company makes a decision to commence a Chapter 11 bankruptcy case or anticipates that an involuntary Chapter 7 bankruptcy is going to be commenced against the Company, the Company shall use its best efforts to pay all undisputed amounts owing to JAS in cash prior to the commencement of the bankruptcy case.

### Jurisdiction and Notice

This Agreement shall be deemed to be made in Colorado. This Agreement and all controversies arising from or relating to performance of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado without giving effect to such state's rules concerning conflicts of laws that might provide for any other choice of law. JAS and the Company hereby irrevocably consent to personal jurisdiction in any State or Federal court located in Laguna, California or Denver, Colorado for the purposes of any suit, action or other proceeding arising out of this Agreement or any of the terms of this Agreement or Transactions contemplated hereby, which is brought by or against either party. JAS and the Company hereby waive any objection to venue with respect thereto, and hereby agree that (except as described under the heading "**Compensation**") all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS AGREEMENT OR CONDUCT IN CONNECTION WITH JAS'S ENGAGEMENT IS HEREBY WAIVED.

The parties hereby designate that any notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) to Springbok Services, Inc. at its offices at 345 Inverness Drive South, Building C, Suite 300, Englewood, CO 80112, Attention: Taylor Ohlsen, CEO; and (b) to JAS, at its offices at 930 Skyline Terrace, Laguna Beach, CA 92651, Attention: James A Skelton, Managing Member. Notice shall be effective upon receipt.

Springbok Services, Inc.
January 25, 2010 Page 6 of 6

**Entire Agreement**

This Agreement (including the indemnification agreement on Attachment A) together with the Mutual NDA embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect and shall not affect all other provisions of this Agreement, all of which shall remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to JAS a duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A, along with the initial payment.

Very truly yours,

JAS FINANCIAL SERVICES, LLC

*[signature]*

James A. Skelton
Managing Member


Confirmed and agreed to on January 25th, 2010

SPRINGBOK SERVICES, INC.

By: *[signature]*
Taylor Ohlsen
CEO

## Attachment A

This Attachment A is pursuant to the letter agreement dated January 25, 2010 and addressed to Springbok Services, Inc. by JAS Financial Services, LLC (the "**Letter**"). Unless otherwise noted, all capitalized terms used herein shall have the meaning set forth in the Letter.

Since JAS will be acting on behalf of the Company in providing financial advisory services and the services of Skelton in the capacity of turnaround manager and restructuring advisor pursuant to the Letter, and as part of the consideration for the agreement of JAS to furnish its services under the Letter, the Company agrees to indemnify and hold harmless JAS and its members and employees (collectively, the "**Indemnified Parties**"), to the fullest extent lawful, against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, to which the Indemnified Parties may become subject arising out of or related to actions taken or omitted to be taken by an Indemnified Party (including acts or omissions constituting ordinary negligence) pursuant to the terms of, or in connection with services rendered pursuant to, the Letter or any transaction or proposed transaction contemplated thereby or any Indemnified Party's role in connection therewith and to reimburse the Indemnified Parties for any legal or other expenses reasonably incurred by them in respect thereof at the time such expenses are incurred; provided, however, the Company shall not be liable under the foregoing indemnity agreement in respect of any loss, claim, damage or liability if a court having jurisdiction shall have determined by a final judgment that such loss, claim, damage or liability resulted primarily from the willful misconduct or gross negligence of the Indemnified Parties. In addition, the Company shall not affect any settlement or release from liability in connection with any matter for which an Indemnified Party would have a right to indemnification from the Company, unless such settlement or release contains a release of the Indemnified Parties reasonably satisfactory in form and substance to them.

If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless, the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such loss, claim, expense, damage, settlement or liability for which such indemnification is held unavailable or is insufficient in such proportion as is appropriate to reflect the relative benefits received or to be received by the Company on the one hand and the Indemnified Party on the other hand in connection with the services rendered by JAS under the Letter. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or otherwise, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and the Indemnified Parties on the other hand in connection with any actions or omissions or any other matters which result in any such loss, claim, expense, damage, settlement or liability as well as any other relevant equitable considerations. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Parties to all losses, claims, damages, liabilities and expenses shall not exceed the amount of fees actually received by JAS pursuant to the Letter. The Company agrees that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in this paragraph.

The reimbursement, indemnity and contribution obligations of the Company set forth herein shall be in addition to any liability which the Company may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, and any such person. No Indemnified Party shall have any liability to the Company or any other person in connection with the services rendered pursuant to the Letter except for any liability for losses, claims, damages or liabilities finally judicially determined by a court having jurisdiction to have resulted primarily from actions taken or omitted to be taken by such Indemnified Party's willful misconduct or gross negligence. The foregoing provisions shall survive any termination of the relationship established by the Letter.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) Chapter 11 |
| SPRINGBOK SERVICES, INC., | ) Case No. 10-25285-HRT |
| EIN: 20-3400089 | ) |
| Debtor. | ) |

### AFFIDAVIT OF JAMES A. SKELTON IN SUPPORT OF APPLICATION FOR ORDER AUTHORIZING THE EMPLOYMENT OF JAS FINANCIAL SERVICES, LLC, AS RESTRUCTURING ADVISOR FOR DEBTOR

STATE OF COLORADO   )
                    ) ss.
COUNTY OF DENVER    )

James A. Skelton, being duly sworn, deposes and says:

1. I am the Managing Member of JAS Financial Services, LLC. ("JAS"). JAS provides independent turnaround management and operational and financial restructuring process management services. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2. I am a turnaround specialist and have over thirty years of experience as a turnaround manager and management consultant, providing leadership and/or management for underperforming companies desirous of change. I have been engaged by parties in several other Chapter 11 bankruptcy cases. Thus, I and JAS are well qualified to undertake the contemplated representation of Debtor.

3. I first performed services for the Springbok Services, Inc. ("Debtor"), on or about January 25, 2010. As of the date hereof, JAS has received the amount of $480,000.00 in the form of retainers (the "Retainer"). Specifically, JAS has received the following retainers on the dated indicated:

| | |
|---|---|
| 2/19/2010 | $ 75,000.00 |
| 2/19/2010 | $ 65,000.00 |
| 3/30/2010 | $ 75,000.00 |
| 3/31/2010 | $ 75,000.00 |
| 5/4/2010 | $ 40,000.00 |
| 5/21/2010 | $ 30,000.00 |
| 5/28/2010 | $ 40,000.00 |
| 6/11/2010 | $ 40,000.00 |



EXHIBIT 3

00124310

4. Through the Petition Date, JAS has applied the sum of $420,000.00 to the Retainer leaving a balance of $60,000.00.

5. JAS has advised Debtor that it will charge Debtor's bankruptcy estate a flat fee of $20,000.00 per week for my full-time attention to the matters for which it is engaged. Debtor will also reimburse JAS for its reasonable out of pocket expenses, including coach class airfare, lodging and meals.

6. Additionally, JAS is entitled to a success fee as set forth in the Engagement Letter although Debtor, with JAS' consent, is not seeking approval of the success fee at this time. Should events occur in the future justifying paying the Success Fee, Debtor will seek approval of the Success Fee at that time.

7. No promises have been received by me or JAS or by any shareholders, counsel or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

8. I have reviewed the list of creditors filed by Debtor. JAS, Debtor and I am unaware of any connections between JAS, me, Debtor and its creditors, other parties in interest, or their respective attorneys and accountants.

9. Neither I nor JAS (i) represent or hold any interest adverse to Debtor or the estate in the matters upon which it is to be employed or in any other matters, (ii) have any connections to Debtor, creditors or any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee, other than as disclosed above, and (iii) are disinterested person within the meaning of 11 U.S.C. § 101.

10. If the Application is approved, I and JAS agree that we shall be bound by any procedures allowed by the Court regarding the interim payment of professional compensation and shall make application to the Court under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure for approval of its fees and expenses from the Debtor.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

James A. Skelton