**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | Chapter 11 |
| SPRINGBOK SERVICES, INC., <br> EIN: 20-3400089 | Case No. 10-25285 HRT |
| Debtor. | |

**MOTION SEEKING EXPEDITED ENTRY OF ORDERS**

SPRINGBOK SERVICES, INC., ("Debtor"), by and through its counsel, Bieging Shapiro & Burrus LLP, hereby submits its Motion Seeking Expedited Entry of Orders (the "Motion").

In support of the Motion, the Debtor state as follows:

**INTRODUCTION**

1. The Motion is filed pursuant to Local Bankruptcy Rule 2081-1. The Debtor seeks the entry of the following order on an expedited basis:

    a. Interim Order Approving Post-Petition Secured and Super-Priority Financing Pursuant to Fed. R. Bank. P. Rule 364(c).

2. The relief sought herein is also set forth on the Cover Sheet filed concurrently herewith. In support of the Motion, the Debtor relies upon and incorporates by this reference the Affidavit of James A. Skelton in Support of the Motion Seeking Expedited Entry of Orders (the "Skelton Affidavit") filed with the Court concurrently herewith and attached hereto as **Exhibit A**.

3. The Debtor hereby certifies that the relief requested herein is needed on an expedited basis to ensure uninterrupted company operations. Only one form of relief is requsted. *See* Local Rule 2081-1. A proposed form of order, in substantial conformity with applicable local rules, is submitted herewith.

4. With respect to the relief requested herein on an interim basis, the Debtor also requests the scheduling of a final hearing (the "Final Hearing") to consider the relief requested herein entry of a final order and approval of the form of notice with respect to the Final Hearing.

A. **Nature of Business and Operations**

5. Debtor is a provider of prepaid MasterCard® card and Visa® cards designed for use in corporate incentive programs, loyalty and rebate programs, as well as for payroll and student tuition programs. There are several distinct activities and organizations that come together to provide prepaid services in the U.S. market:

a. *Banks or "The Issuers"* – Banks are the only organizations that can provide membership in the MasterCard® and Visa® networks. They are required to approve each card program and hold all card balances in trust for cardholders.

b. *Associations or "The Brands"* – The primary payment card networks in the United States are MasterCard®, Visa®, Discover® and American Express®. These organizations own the recognized payment brands and maintain the global networks that provide acceptance at merchant locations, and thus connect cardholders with merchants and banks.

c. *Processors and Cardholder Services Providers* – Processors integrate with the electronic systems of the associations to authorize and settle purchases, track cardholder information and transaction activity, provide customer service and move money between entities. The cardholder services function involves providing call center agents and integrated voice response (IVR) systems to respond to cardholder questions and resolve issues that may arise in card usage. Debtor serves as the processor of its own transactions, and in that capacity, is a Visa®- and MasterCard®-approved processor.

d. *Program Managers* – In the prepaid industry, program managers are the organizations that assemble the necessary components to create, develop, launch and maintain a prepaid card program, such as a corporate incentive programs. They maintain the client relationship and are responsible for the program's success.

e. *Card Production and Fulfillment* – Every card that is manufactured needs to be designed, embossed, encoded, packaged and delivered in a highly secure environment.

6. Debtor serves as the Processor, Program Manager, Cardholder Service Provider and it manufactures, embosses and fulfills prepaid cards for all of its card programs.

7. Debtor operates a vertically-integrated model which distinguishes it from most other companies in this otherwise fragmented industry. By delivering an integrated, end-to-end solution, Debtor controls its ability to deliver high-quality, customized solutions, maintains control over the cost to deliver any single program to a client and serves as a single point of accountability to a corporate client for successful program execution. This vertically-integrated solution has enabled Debtor to differentiate itself from competitors and win business through full-service, data-rich products.

8. Debtor works with three banks that sponsor prepaid card programs that are processed and program managed by Debtor: (i) The Bancorp Bank ("Bankcorp"), (ii) KeyBank National Association ("KeyBank"), and (iii) MetaBank ("Meta").

9. Debtor generates revenue from three primary sources:

a. *Card service fees* – One-time, service fees for program management, card manufacturing, fulfillment, processing and call-center support.

b. *Expired card and cardholder fees* – Fees collected from cardholders directly, including expiration and maintenance fees, ATM, reload and card replacement fees.

c. *Interchange fees* – Per transaction, percentage fees collected from merchants as the cards are used.

10. In addition to these revenue sources, Debtor also generates income from interest earned on cardholder funds.

11. Debtor currently has approximately 2,100 customers with approximately 1.9 million cards issued. Debtor's current revenues are approximately $800,000.00 per month.

12. The Debtor's only current officers are Terry Zinsli as the interim Chief Financial Officer and Mr. Skelton as the Chief Restructuring Officer.

13. Debtor has approximately 8,352,426 outstanding shares of stock owned by seventy-four (74) shareholders with three (3) shareholders owning about seventy-percent of the outstanding shares.

14. Debtor leases three separate facilities in Englewood, Colorado: (a) a card production, fulfillment and data center facility, (b) an executive and sales offices, and (c) former office space used as an executive and sales office, which has been sublet to a third party. The first two leases expire on March 31, 2014, and the third lease expires on May 31, 2012. Additionally, Debtor leases an office in Cleveland, Ohio for general office purposes. That lease expires on January 31, 2011.

15. Since December 2009, Debtor has reduced its 127 person workforce to approximately nine (10). These employees are what Debtor has determined are needed to allow Debtor to continue servicing the prepaid cards. Additionally, Debtor has 23 other employees on standby with respect to a certain aspect of the Debtor's business in the event a sale of that segment of the business is realized in a going-concern transaction; these standby employees are not covered in the current Budget.

B. **History**

16. Debtor was founded in 1998 as The Best Present Company, Inc., by Dwayne Jones, Taylor Ohlsen, and Christian Steensland. Both Dwayne Jones and Taylor Ohlsen are still on Debtor's board of directors. The Company was reincorporated in Delaware as Springbok Services, Inc., in December 2005. Originally providing prepaid MasterCard® gift cards to consumers, Debtor shifted its focus from providing prepaid cards in a direct-to-consumer model towards a business-to-business model in 2001.

17. In 2005, Debtor's proprietary prepaid card processing platform was first certified for compliance with the Payment Card Industry Data Security Standards ("PCI-DSS") and Debtor first received SAS 70-Type II compliance in 2007. Debtor regularly updates its compliance with these standards.

18. Over the past several years, Springbok has invested substantial resources in developing its highly scalable operations and technology infrastructure. During that time, the Company also became certified to provide network-branded open-loop prepaid cards from both MasterCard® and Visa®.

C. **Capitalization and Ongoing Funding**

19. In its early formative years, the Company was funded by capital raised from friends and family and the sweat equity of its founders. As the Company grew, the Company used its growing revenues to fund growth.

20. Prior to the Goldman-Sachs investment in 2007, the Company funded its growth through a combination of angel investors (including friends and family) and revolving loans from Richard Madden, an early investor in the Company. At the time of the Goldman-Sachs investment, Mr. Madden exchanged outstanding indebtedness of approximately $2 million into Series A-1 Preferred Stock of the Debtor.

21. On July 27, 2007, Goldman-Sachs closed on an investment of $15 million in Series A-2 Preferred Stock of Debtor. This influx of capital was used for capital expenditures as well as funding ongoing operating losses. In spite of this infusion of capital and despite rising revenues, Debtor experienced operating losses.

22. Debtor has demonstrated solid revenue growth in recent years, growing from $3 million in 2006 to $13.2 million in 2009 on a pre-audit basis. However, Debtor has not achieved positive EBITDA or cash flow primarily due to Debtor's fixed and variable expenses which have continued to exceed revenues. After eleven plus years in business, Debtor reached a crucial point in its business development. Having invested heavily in scalable infrastructure and organizational development, Springbok's overhead expenses continued to exceed its revenue and it has yet to achieve self-sustaining net profitability.

23. Throughout 2008, management sought additional financing to fund working capital deficits. Given the downturn in the worldwide economy, these efforts were difficult at best. By May 2009, Debtor exhausted existing funding to comfortably run operations, and requested additional capital from Goldman-Sachs. Those efforts were likewise unsuccessful.

24. On June 6, 2009, Lois LeMenager, president and owner of one of Debtor's customers, Marketing Innovators, provided Debtor with a $3 million capital infusion in the form of a convertible note.

25. Thereafter, Debtor continued its efforts to raise additional capital.

26. On August 14, 2009, Bancorp provided Debtor with a senior secured term loan in the principal amount of $5 million.

27. In the fall of 2009, Debtor engaged in a broad capital raising process led by the investment banking firm Raymond James Financial, Inc. ("Raymond James"). Although it generated significant interest from a range of strategic and financial investors (presenting the Debtor with nearly eighty (80) parties), but no transactions were consummated.

D. **Events Leading to Chapter 11 filing**

28. On January 4, 2010, a major channel partner of Debtor, Group Ō, Inc., unilaterally and, the Debtor believes, improperly terminated its prepaid programs being processed and managed by Debtor. The Group Ō Agreement was forecasted to generate $8.7 million in revenue in 2010 which amount represented approximately thirty-five percent (35%) of Debtor's forecasted revenue for 2010. With this major program cancellation, Debtor found itself facing net operating losses and the need to restructure its Balance Sheet in order to attract new capital investment.

29. With the Group Ō termination, management immediately sought retention of professions with appropriate experience with financially distressed businesses.

30. Over the last several months, Debtor engaged Integris Partners to provide investment banking services to Debtor. These efforts resulted in contact with more than thirty (30) parties, some of which were initially contacted by Raymond James. Although there were expressions of various levels of interest, with offers being made, Debtor was unable to close any capital raising transactions. In fact, even though Debtor accepted a non-binding offer from a group led by Lee Equity based in New York and proceeded with detailed due diligence and negotiations over several weeks, the Debtor was unable to move the Lee Equity offer to closing.

31. After the termination of the Lee Equity offer in May 2010, Skelton reached back out to Prepaid Solutions, Inc. ("Prepaid Solutions"), which was a logical strategic buyer in that it has a similar business model that markets and sell network branded prepaid debit cards for the payroll and general purpose reloadable card market. After extensive good faith and arm's-length negotiations with Prepaid Solutions, Debtor initially secured both debtor-in-possession and exit financing commitments from Prepaid Solutions. However, at the eleventh hour, this deal fell through.

32. Within the last several days, Debtor has been able to secure DIP financing in the amount of approximately $1.1 million from KeyBank to be used to fund cash needs associated with operations during the pendency of the case and expenses associated with the Chapter 11 Case itself.

**RELIEF SOUGHT ON AN EXPEDITED BASIS**

**INTERIM ORDER APPROVING POSTPETITION SECURED AND SUPERPRIORITY FINANCING PURSUANT TO § 364(C)**

33. Debtor is seeking secured post-petition financing (the "DIP Loan") from KeyBank. The terms of the financing are set forth in the proposed Interim Order (I) Authorizing Debtor to Incur Postpetition Secured Superpriority Indebtedness Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507; (II) Modifying the Automatic Stay; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "Order"). A copy of the Order is attached as **Exhibit 2** to the Affidavit.

5

34. Debtor has determined that it will need approximately $1,100,000.00 in working capital from the Petition Date through September 12, 2010, to be used to fund operations and bankruptcy expenses as set forth in the Budget attached as **Exhibit 1** (the "Budget") to the Affidavit. In order to do so, Debtor is seeking Court approval of a secured loan from KeyBank (the "DIP Loan"), on both an interim basis and final basis.

35. As briefly described above, over the last year, Debtor has engaged two (2) separate investment banking firms, Raymond James Financial, Inc., and Integris Partners, to investigate sources of financing to continue operations. Between Raymond James and Integris over 100 financial and strategic potential investors were contacted. Among those, several dozen parties signed NDA's and engaged in some level of due diligence. In March 2010, contact with Lee Equity Partners ripened into an non-binding letter of intent, but that letter of intent was ultimately terminated in May. Shortly thereafter, Debtor re-engaged with Prepaid Solutions who had elected to proceed with an acquisition of the Debtor in the context of this Chapter 11 case but such deal fell through at the eleventh hour.

36. Based upon all of those previous discussions, there are no other viable financial options available to the Debtor, on any terms, other than those presented by KeyBank in the Order. *See* Skelton Affidavit.

37. The complete terms and conditions of the proposed DIP Loan are set forth in total in the Order, with the key terms summarized as follows:

    a. Maximum Loan Amount: $1,056,000.00.

    b. Type of Loan: Term loan with multiple advances; Debtor can draw up to an aggregate of $1,056,000 an as-needed basis, but amounts repaid cannot be re-borrowed.

    c. Permitted Uses: As set forth on the Budget.

    d. Regular Rate of Interest: Prime plus 6%, calculated from date of each advance.

    e. Fees: $24,000.00.

    f. Collateral: First priority security interest in all assets of the Debtor that are not subject to pre-petition liens, including Avoidance Actions, and junior lien on all assets subject to pre-petition liens in order of priority as determined by applicable non-bankruptcy law.

    g. Priority Rights: Bankruptcy Code §§ 364(c) and 507(b).

    h. Priming Lien: None.

    i. Condition to Loan: Entry of an interim order approving the DIP Loan under Bankruptcy Code § 364(c).

      j.      Payment: Paid from otherwise unencumbered estate assets and proceeds of sale of assets.

38. Debtor has an immediate need to obtain financing on an interim basis pending a final hearing on the Motion to (a) permit the orderly continuation of the business and to preserve its assets and enterprise value and (b) satisfy other costs of administration of the Chapter 11. Failure to have funds available for these purposes would result in immediate, irreparable loss and damage to the bankruptcy estate.

39. Absent the immediate availability of new funds, Debtor's operations will be severely disrupted and it will be forced to cease the operation of the business, which would severely diminish, if not extinguish, the enterprise value of Debtor's business. The ability of Debtor to obtain sufficient working capital and liquidity through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to preservation and maintenance of the value of Debtor's assets.

40. The Order was negotiated in good faith and at arms' length, with all parties represented by counsel. Debtor believes that the terms of the Order are fair and reasonable, and obtaining approval of Order will be in the best interests of Debtor, its estate and creditors.

41. Pursuant to Fed. R. Bankr. P. 4001(c), the Court may set a final hearing on a motion for authority to obtain credit, fourteen (14) days after service of the motion. Fed. R. Bankr. P. 4001(c)(2). The rules further provide that the Court may authorize the obtaining of credit prior to expiration of the fourteen (14) day period, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." *Id*.

42. Debtor's Board of Directors has concluded that the Order is the best alternative available in the circumstances of this case. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. *See, e.g., In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

43. Accordingly, Debtor respectfully requests that the Court authorize Debtor to incur postpetition secured and superpriority financing under 11 U.S.C. § 364(c), in accordance upon the terms and conditions set forth in this Motion and the proposed interim and final orders filed herewith.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter the order filed herewith on an expedited basis and grant such other relief as deemed appropriate.

Dated: June 25, 2010.

        BIEGING SHAPIRO & BURRUS, LLP

        By: /s/ Duncan E. Barber
            Duncan E. Barber, #16768
            Steven T. Mulligan, #19901
        4582 S Ulster Street Parkway, Ste. 1650
        Denver, Colorado 80237
        Telephone: (720) 488-0220
        Facsimile: (720) 488-7711
        Email: dbarber@bsblawyers.com
        Email: smulligan@bsblawyers.com

        Proposed Counsel for Springbok Services, Inc.