# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPRINGBOK SERVICES, INC., | ) | Case No. 10-25285 HRT |
| EIN: 20-3400089 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**AFFIDAVIT OF JAMES A. SKELTON IN SUPPORT OF**
**MOTION SEEKING EXPEDITED ENTRY OF ORDERS**

STATE OF COLORADO  )
                              ) ss.
COUNTY OF DENVER  )

James A. Skelton, under penalty of perjury, being duly sworn, deposes and says:

1. I am the Managing Member of JAS Financial Services, LLC ("JAS"). JAS provides independent turnaround management and operational and financial restructuring process management services. Since January 25, 2010, I have served as an advisor to Springbok Services, Inc. ("Debtor" or the "Company"). Effective March 19, 2010 I was also appointed by the Springbok Board of Directors as the Chief Restructuring Officer of the Company.

2. In my capacity as both advisor and Chief Restructuring Officer to the Company, I have become extremely familiar with Debtor's business operations, and thus I have personal knowledge of the matters set forth herein.

3. On June 18, 2010 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Debtor is operating its business and managing its properties as debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made, and no committees have been appointed or designated.

4. This affidavit (the "Affidavit") is submitted in support of Debtor's Motion Seeking Expedited Entry of Orders (the "Motion") filed concurrently herewith and described in more detail below. Except as otherwise indicated, all facts set forth in the Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of Debtor's operations and financial condition.

EXHIBIT A

00124869-7

## HISTORY AND BACKGROUND

A. **Nature of Business and Operations**

5. Debtor is a provider of prepaid MasterCard and Visa debit cards designed for use in corporate incentive, loyalty and rebate programs, as well as for payroll and student tuition programs. There are several distinct activities and organizations that come together to provide prepaid card services in the U.S. market:

- *Banks or "The Issuers"* – Banks are the only organizations that can provide membership in the MasterCard® and Visa® networks. They are required to approve each card program and hold all card balances in trust for cardholders.

- *Associations or "The Brands"* – The primary payment card networks in the United States are MasterCard®, Visa®, Discover® and American Express®. These organizations own the recognized payment brands and maintain the global networks that provide acceptance at merchant locations, and thus connect cardholders with merchants and banks.

- *Processors and Cardholder Services Providers* – Processors integrate with the electronic systems of the associations to authorize and settle purchases, track cardholder information and transaction activity, provide customer service and move money between entities. The cardholder services function involves providing call center agents and integrated voice response (IVR) systems to respond to cardholder questions and resolve issues that may arise in card usage. Debtor serves as the processor of its own transactions, and in that capacity, is a Visa- and MasterCard-approved processor.

- *Program Managers* – In the prepaid industry, program managers are the organizations that assemble the necessary components to create, develop, launch and maintain a prepaid card program, such as a corporate incentive programs. They maintain the client relationship and are responsible for the program's success.

- *Card Production and Fulfillment* – Every card that is manufactured needs to be designed, embossed, encoded, packaged and delivered in a highly secure environment.

6. Debtor serves as the Processor, Program Manager, Cardholder Service Provider and it manufactures, embosses and fulfills prepaid cards for all of its card programs.

7. Debtor operates a vertically-integrated model which distinguishes it from most other companies in this otherwise fragmented industry. By delivering an integrated, end-to-end solution, Debtor controls its ability to deliver high-quality, customized solutions, maintains control over the cost to deliver any single program to a client and serves as a single point of accountability to a corporate client for successful program execution. This vertically-integrated

solution has enabled Debtor to differentiate itself from competitors and win business through full-service, data-rich products.

8. Employee incentive cards are offered by an employer to employees or sales channel participants to incentivize sales improvement, meet objectives, reduce costs and achieve certain other goals and milestones. Employee incentive cards are also frequently known as corporate rewards cards, health and wellness cards and bonus cards.

9. Prepaid payroll cards are a convenient, cost-effective and green alternative to paper checks. Springbok's automated payroll offering enables companies to: (i) lower operational costs; (ii) optimize payment processes by avoiding production, handling, and distribution of checks; (iii) eliminate the time constraints and fees associated with lost and stolen checks; and (iv) enhance "green" initiatives. For employees, Springbok's prepaid payroll cards (i) eliminate the need to stand in line at a bank or check cashing service; (ii) provide immediate access to their funds via more than 37,000 surcharge-free ATMs across the country and more than one million ATMs worldwide; (iii) offer cardholders access to transaction history and customer support twenty-four hours a day, seven days a week; (iv) provide better security than paper checks; and (v) can be used to make purchases anywhere debit cards of the payment network appearing on the face of the card are accepted

10. Student tuition refund cards are a convenient method for disbursing financial aid to students after the higher education institution subtracts the amount of tuition from the financial aid checks that it receives from third party sources. The benefits to the higher education institution include (i) saving money by reducing disbursement expenses; (ii) streamlining disbursement operations; (iii) reducing student uncertainty about their funds; and (iv) enhancing the school's identity through customization options.

11. Debtor works with three banks that sponsor prepaid card programs that are processed and program managed by Debtor: (i) The Bancorp Bank ("Bancorp"), (ii) KeyBank National Association ("KeyBank"), and (iii) MetaBank ("Meta").

12. Debtor generates revenue from three primary sources:

- *Card service fees* – One-time, service fees for program management, card manufacturing, fulfillment, processing and call-center support.

- *Expired card and cardholder fees* – Fees collected from cardholders directly, including expiration and maintenance fees, ATM, reload and card replacement fees.

- *Interchange fees* – Per transaction, percentage fees collected from merchants as the cards are used.

13. In addition to these revenue sources, Debtor also generates income from interest earned on cardholder funds.

14. Shortly before the filing of the petition initiating this Chapter 11 case, Debtor currently had approximately 2,100 customers with approximately 1.9 million cards issued. At the time of filing, Debtor's current revenues are approximately $800,000.00 per month.

15. The Debtor's only current officers are Terry Zinsli as the interim Chief Financial Officer and me as the Chief Restructuring Officer.

16. Debtor has approximately 8,352,426 outstanding shares of stock owned by seventy-four shareholders with three shareholders owning about seventy-percent of the outstanding shares.

17. Debtor leases three separate facilities in Englewood, Colorado: (a) a card production, fulfillment and data center facility, (b) an executive and sales offices, and (c) former office space used as an executive and sales office, which has been sublet to a third party. The first two leases expire on March 31, 2014, and the third lease expires on May 31, 2012. Additionally, Debtor leases an office in Cleveland, Ohio for general office purposes. That lease expires on January 31, 2011.

18. Since December 2009, Debtor has reduced its 127 person workforce approximately nine (9). These employees are what Debtor has determined are needed to allow Debtor to continue servicing the prepaid cards. Additionally, Debtor has 23 other employees on standby with respect to a certain aspect of the Debtor's business in the event a sale of that segment of the business is realized in a going-concern transaction; these standby employees are not covered in the current Budget.

B.  History

19. Debtor was founded in 1998 as The Best Present Company, Inc. by Dwayne Jones, Taylor Ohlsen, and Christian Steensland. Both Dwayne Jones and Taylor Ohlsen are still on Debtor's board of directors. The Company was reincorporated in Delaware as Springbok Services, Inc., in December 2005. Originally providing prepaid MasterCard® gift cards to consumers, Debtor shifted its focus from providing prepaid cards in a direct-to-consumer model to a business-to-business model in 2001.

20. In 2005, Debtor's proprietary prepaid card processing platform was first certified for compliance with the Payment Card Industry Data Security Standards ("PCI-DSS") and Debtor first received SAS 70-Type II compliance in 2007. Debtor regularly updates its compliance with these standards. These compliance certifications allow the Company to maintain its licenses with the payment networks to perform the card processing and program management activities that it performs today.

21. Over the past several years, Springbok has invested substantial resources in developing its highly scalable operations and technology infrastructure. During that time, the Company also became certified to provide network-branded open-loop prepaid cards from both MasterCard® and Visa®.

C.  Capitalization and Ongoing Funding

22. In its early formative years, the Company was funded by capital raised from friends and family and the sweat equity of its founders. As the Company grew, the Company used its growing revenues to fund growth.

23. Prior to the Goldman-Sachs investment in 2007, the Company funded its growth through a combination of angel investors (including friends and family) and revolving loans from Richard Madden, an early investor in the Company. At the time of the Goldman-Sachs investment, Mr. Madden exchanged outstanding indebtedness of approximately $2 million into Series A-1 Preferred Stock of the Debtor.

24. On July 27, 2007, Goldman-Sachs closed on an investment of $15 million in Series A-2 Preferred Stock of Debtor. This influx of capital was used for capital expenditures as well as funding ongoing operating losses. In spite of this infusion of capital and despite rising revenues, the Debtor experienced operating losses.

25. Debtor has demonstrated solid revenue growth in recent years, growing from $3 million in 2006 to $13.2 million in 2009 on a pre-audit basis. However, Debtor has not achieved positive EBITDA or cash flow primarily due to Debtor's fixed and variable expenses which have continued to exceed revenues. After eleven plus years in business, Debtor reached a crucial point in its business development. Having invested heavily in scalable infrastructure and organizational development, Springbok's overhead expenses continued to exceed its revenue and it has yet to achieve self-sustaining net profitability.

26. Throughout 2008, management sought additional financing to fund working capital deficits. Given the downturn in the worldwide economy, these efforts were difficult at best. By May 2009, Debtor exhausted existing funding to comfortably run operations, and requested additional capital from Goldman-Sachs. Those efforts were likewise unsuccessful.

27. On June 6, 2009, Lois LeMenager, president and owner of one of Debtor's customers, Marketing Innovators, provided Debtor with a $3 million capital infusion in the form of a convertible note, which allowed LeMenager to convert all or a portion of the principal amount into equity rather than receiving principal repayment.

28. Thereafter, Debtor continued its efforts to raise additional capital.

29. On August 14, 2009, Bancorp provided Debtor with a senior secured term loan in the principal amount of $5 million.

30. In the fall of 2009, Debtor engaged in a broad capital raising process led by the investment banking firm Raymond James Financial, Inc. ("Raymond James"). Although it generated significant interest from a range of strategic and financial investors (presenting the Debtor with nearly eighty (80) parties), no capital raising transactions were ever consummated.

D. **Events Leading to Chapter 11 filing**

31. On January 4, 2010, a major channel partner of Debtor, Group Ō, Inc., unilaterally, and the Debtor believes improperly, terminated its prepaid programs being processed and managed by Debtor. The Group Ō Agreement was forecasted to generate $8.7 million in revenue in 2010 which amount represented approximately thirty-five percent (35%) of Debtor's forecasted revenue for 2010. With this major program cancellation, Debtor found itself facing net operating losses and the need to restructure its Balance Sheet in order to attract new capital investment.

32. With the Group Ō termination, management immediately sought retention of professionals with appropriate experience with financially distressed businesses. By the end of January, both bankruptcy counsel and I had been retained.

33. Over the last several months, Debtor engaged Integris Partners to provide investment banking services to Debtor. These efforts resulted in contact with more than thirty (30) parties, some of which were initially contacted by Raymond James. Although there were expressions of various levels of interest, with offers being made, Debtor was unable to close any capital raising transactions. In fact, even though Debtor accepted a non-binding offer from a group led by Lee Equity based in New York and proceeded with detailed due diligence and negotiations over several weeks, the Debtor was unable to move the Lee Equity offer to closing.

34. After the termination of the Lee Equity offer in May 2010, I reached back out to Prepaid Solutions, Inc. ("Prepaid Solutions"), which was a logical strategic buyer in that it has a similar business model that markets and sell network branded prepaid debit cards for the payroll and general purpose reloadable card market. After extensive good faith and arm's-length negotiations with Prepaid Solutions, Debtor initially secured both debtor-in-possession and exit financing commitments from Prepaid Solutions. However, at the eleventh hour, this deal fell through.

35. Within the last several days, Debtor has been able to secure DIP financing in the amount of $1.1 million from KeyBank to be used to fund cash needs associated with operations during the pendency of the case and expenses associated with the Chapter 11 case itself.

## REQUESTED FIRST DAY MOTIONS

**A.     Cash Collateral:  No Relief Requested a This Time.**

36. As of the Petition Date, the Debtor had on deposit approximately $3,377,730.00.

37. Since the Petition Date, a creditor unilaterally effectuated a reversal of a pre-petition ACH transfer and was able to debit the account for approximately $300,000.00. That post-petition debit appears to be a violation of Bankruptcy Code § 549(a). Since learning of this, Debtor has taken the necessary steps to prevent this from occurring.

38. Additionally, approximately $2,377,730.00 deposit was returned post-petition as a result of a wire transfer that had been ordered pre-petition but unknowingly to me had not been effectuated pre-petition. Upon learning of this, we began immediately to address this issue with the creditor. These funds were received via wire transfer on Thursday, June 17, 2010 and are designated for reload cards in a program administered by KeyBank.

39. The balance in the Debtor's DIP bank account is approximately $700,000.00. There are a number of competing interests in these funds.

40. Debtor does not believe it is reasonably practicable to seek consent to the use of these funds from the competing interests. As a result, Debtor does not intend to use these funds at this time. Further, Debtor acknowledges that these funds may not be used without a Court order or consent amount the interest holders.

**B.     DIP Financing**

41.     Debtor has determined that it will need approximately $1,056,000.00 in working capital from the Petition Date through September 12, 2010, to be used to fund operations and bankruptcy expenses as set forth in the Budget attached as **Exhibit 1** (the "Budget"). In order to do so, Debtor is seeking Court approval of a secured DIP loan from KeyBank (the "DIP Loan"), on both an interim basis and final basis.

42.     As briefly described above, over the last year, Debtor has engaged two (2) separate investment banking firms, Raymond James Financial, Inc., and Integris Partners, to investigate sources of financing to continue operations. Between Raymond James and Integris over 100 financial and strategic potential investors were contacted. Among those, several dozen parties signed NDA's and engaged in some level of due diligence. In March 2010, contact with Lee Equity Partners ripened into an non-binding letter of intent, but that letter of intent was ultimately terminated in May. Shortly thereafter, we re-engaged with Prepaid Solutions who had elected to proceed with an acquisition of the Debtor in the context of this Chapter 11 case but such deal fell through at the eleventh hour.

43.     Based upon all of those previous discussions, there are no other viable financial options available to the Debtor, on any terms, other than those presented by KeyBank in the proposed DIP Order, a copy of which is attached as **Exhibit 2** (the "DIP Order").

44.     Moreover, over the last two weeks, I have attempted to obtain (i) unsecured credit allowable under § 364(a) or (b) of the Bankruptcy Code, but have not been successful at this time, and (ii) secured credit under § 364(c) of the Bankruptcy Code, on terms more favorable than under the terms provided herein. Over the past two weeks in preparation for the Springbok bankruptcy filing I have contacted the following potential sources of Debtor-in-Possession financing, with the associated feedback and results:

   a.   Bank of America Business Credit - Turndown due to size (too small) and unwillingness to prime pre-petition senior secured lender

   b.   Ableco Finance, LLC - Turndown due to size (too small) and lack of traditional collateral (A/R and Inventory)

   c.   Dymas Capital Management Company, LLC - Turndown due to size (too small) and lack of collateral

   d.   Bancorp Bank - Current Springbok prepetition senior secured lender declined to increase exposure above current $5MM outstanding principal balance, but agreed to be primed by an approved strategic investor.

45.     In addition, I have had numerous conversations with both MetaBank and Bancorp on their willingness to participate in the DIP Loan, but both have declined to participate at this time.

46. Without the DIP Loan to be provided by KeyBank, the Debtor would be unable to maintain its minimal staff (9 employees) to operate the on-going card processing function and a possible going-concern sale of certain of the Debtor's assets.

47. The complete terms and conditions of the proposed DIP Loan are set forth in total in the Order, with the key terms summarized as follows:

    (a) Maximum Loan Amount: $1,056,000.00.

    (b) Type of Loan: Term loan with multiple advances; Debtor can draw up to an aggregate of $1,056,000 an as-needed basis, but amounts repaid cannot be re-borrowed.

    (c) Permitted Uses: As set forth on the Budget.

    (d) Regular Rate of Interest: Prime plus 6%, calculated from date of each advance.

    (e) Fees: $24,000.00.

    (f) Collateral: First priority security interest in all assets of the Debtor that are not subject to pre-petition liens, including Avoidance Actions, and junior lien on all assets subject to pre-petition liens in order of priority as determined by applicable non-bankruptcy law.

    (g) Priority Rights: Bankruptcy Code §§ 364(c) and 507(b).

    (h) Priming Lien: None.

    (i) Condition to Loan: Entry of an interim order approving the DIP Loan under Bankruptcy Code § 364(c).

    (j) Payment: Paid from otherwise unencumbered estate assets and proceeds of sale of assets.

48. Debtor has an immediate need to obtain financing on an interim basis pending a final hearing on the Motion to (a) permit the orderly continuation of the business and to preserve its assets and enterprise value and (b) satisfy other costs of administration of the Chapter 11. Failure to have funds available for these purposes would result in immediate, irreparable loss and damage to the bankruptcy estate.

49. Absent the immediate availability of new funds, I believe that Debtor's operations will be severely disrupted and it will be forced to cease the operation of the business, which would severely diminish, if not extinguish, the enterprise value of Debtor's business. The ability of Debtor to obtain sufficient working capital and liquidity through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to preservation and maintenance of the value of Debtor's assets.

50. The Order was negotiated in good faith and at arms' length, with all parties represented by counsel. I believe that the terms of the Order are fair and reasonable, and obtaining approval of Order will be in the best interests of Debtor, its estate and creditors.

51. For the reasons set forth above, I respectfully request that the Court grant the relief requested in the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: June 25, 2010.

/s/ James A. Skelton
James A. Skelton