**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPRINGBOK SERVICES, INC., | ) Case No. 10-25285-HRT |
| EIN: 20-3400089 | ) |
| | ) |
| Debtor. | ) |
| | ) |

---

**MOTION FOR ORDER (1) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTOR'S BANKRUPTCY ESTATE, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (2) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE**

---

Springbok Services, Inc., ("Debtor"), by and through its counsel, Bieging Shapiro & Burrus LLP, pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 2002 and 6004, for its Motion for Order (1) Authorizing the Sale of Certain Assets of Debtor's Bankruptcy Estate, Free and Clear of Liens, Claims, Interests and Encumbrances, and (2) Scheduling a Hearing To Consider Approval of the Sale (this "Motion"), and in support hereof, Debtor states as follows:

## I.    INTRODUCTION

1.    On June 18, 2010 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code.  Debtor continues in possession of its assets as a debtor in possession under 11 U.S.C. §§ 1107 and 1108.  An official unsecured creditors' committee was formed on June 29, 2010.

2.    On June 25, 2010, Debtor filed its Motion for Expedited Entry of Order, seeking authority to incur postpetition secured and superpriority financing from KeyBank. [Dkt. No. 29] In this motion, Debtor requested approval of a debtor-in-possession facility of advances of new funds by KeyBank National Association ("KeyBank") in an amount of approximately $1,075.000.00 (the "DIP Facility").

3.    On July 28, 2010, the Court entered its Final Order (I) Authorizing Debtor to Incur Postpetition Secured Superpriority Indebtedness pursuant to Sections 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 507; (II) Modifying the Automatic Stay; and (III) Scheduling a Final Hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "Final Financing Order") [Dkt. No. 127].

4.    The Final Financing Order authorizes Debtor to utilize the DIP Facility up to the amount of $1,075,000.00 in accordance with the budget attached to the Final Financing Order (the "Budget").  The Budget is projected to end on August 27, 2010, although Debtor is currently ahead of the Budget and it is anticipated that sufficient funds will remain to enable Debtor to consummate the sales transaction contemplated by this Motion.

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

15.     A party's consent for a free and clear transfer under § 363(f)(2) may be implied and an interest holder's failure to object, after due notice and an opportunity, qualifies as consent for purpose of a free and clear transfer. *See e.g., Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345-46 (Bankr. E.D. Pa. 1988); *Hargrave v. Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994).

16.     In this instance, Bancorp has consented to the sale of the Property free and clear of its lien subject to the provisio that net proceeds from the sale be paid to Bancorp.

17.     Douglas County has filed a Proof of Claim in the amount of $90,578.00, designated at Claim No. 47 (the "Douglas County Claim") for 2010 personal property taxes. Douglas County asserts that  the Douglas County Claim enjoys a first priority lien pursuant to Colo. Rev. Stat. § 39-1-207.

18.     On August 20, 2010, Debtor filed its Expedited (1) Application to Employ and Compensate Auctioneer, and (2) Motion to Sell Property of the Estate Free and Clear of Liens and Encumbrances (the "Auction Motion") [Dkt. No. 157], seeking authority to employ and compensate an auctioneer to sell certain of Debtor's assets, excluding the Property, at an auction.

19.     Debtor is guaranteed to receive at least $200,000.00 from the auction.  As provided for in the Auction Motion, $90,578.00 of the proceeds generated from the auction will be set aside for the Douglas County Claim with Douglas County's lien attached to such proceeds. Thus, Douglas County is fully protected by proceeds that Debtor will receive from the auction. Thus, no further proceeds need be set aside from this sale for Douglas County and the Property can be sold free and clear of Douglas County's lien.

20.     Debtor believes that the interests describe above are all of the interests asserted against or in the Property.

21.     Based upon the foregoing, Debtor believes that the Property may be sold to the buyer free and clear of such interests.

## IV.     OVERBID AND AUCTION TERMS AND PROCEDURES

22.     The APA is also conditioned upon the entry of an order by the Bankruptcy Court approving certain sale and bidding procedures (the "Bid Procedures Order").   The Bid Procedures are summarized as follows:

a.   **Auction.**  If no objections are filed opposing these bid procedures, a public auction will be conducted at the offices of Debtor's offices at 345 Inverness Drive South, Building A, Suite A-140 on September 14, 2010, commencing at 9:00 a.m., or, in the event that objections are filed, on September 16, 2010, at 9:00 a.m. (the "Auction").  At the Auction, any bid in excess of FTPS' offer ("Overbid") must be in writing on an executed bid form (a "Bid Form").  Each written Overbid submitted to Debtor at the auction will be immediately read aloud to all bidders.  The Overbids will be taken in the order submitted to Debtor.  Debtor will review all Overbids and will determine if the Overbid meets the minimum requirements for an overbid and is the highest and best bid.  Bidding will be in fifteen (15) minute timed increments and shall end if no bids are submitted in a given fifteen minute time period.  In the event one or more subsequent qualifying Overbids are made, the last and highest such subsequent qualifying Overbid will be deemed the successful bid (the "Successful Bidder") and Debtor will sign the Bid Form of the Successful Bidder and the Successful Bidder will be deemed the buyer of the Property.

b.   **Overbids.**  Any initial Overbid must be at least $125,000.00 in excess of the Purchase Price.  If the Debtor receives Overbids, bids at the Auction must be in increments of $50,000.00 over the preceding Overbid.

i.   Debtor will contact prospective bidders regarding the Auction and will notify these persons that they are required to pre-qualify with Debtor on or before September 10, 2010 (the "Overbid Deadline") by providing information and documentation to Debtor sufficient to demonstrate their financial capacity to close the transactions contemplated in this APA.  FTPS is deemed to be a Qualified Bidder.

ii.   In addition to such information, as part of the pre-qualification process, each overbidder must deliver to Debtor by the Overbid Deadline:

A.   An earnest money deposit of $125,000.00 by cashier's check or other immediately available funds made payable to Debtor. Deposits will be nonrefundable if the Bankruptcy Court accepts the bid of such overbidder and such overbidder fails to consummate the transactions contemplated hereby due to such overbidder's default; and

B.   An executed Bid Form that in substance provides that by executing the Bid Form, the proposed overbidder acknowledges that the overbidder has read this APA and agrees (i) to be bound by the terms and conditions of the APA; (ii) that, if the proposed overbidder's bid at the Auction is accepted, the overbidder is obligated to close the purchase transaction on the Closing Date; and (iii) that, if the overbidder fails to timely close the purchase transaction, the overbidder will be in default, the overbidder's earnest money deposit will be forfeited, and Debtor will be free to sell the Property to the next highest bidder then willing and able to close.

c.      All Overbids (other than overbids made by FTPS) must (i) provide for a minimum cash deposit of $125,000.00 in the form of a cashier's check; (ii) provide for a purchase of the Property for cash only, to close on or before the Closing Date; (iii) not have conditions to close not present in the APA; and (iv) be submitted in writing by the Overbid Deadline.

d.      **Break-up Fee and Expense Reimbursement.**   In the event that the Successful Bidder is a person other than FTPS or if the Property is acquired in a transaction not contemplated by the APA through no fault of FTPS, at a closing or consummation of such transaction, Debtor will pay to FTPS a break-up fee in the amount of $30,000.00 (the "Break-Up Fee") for proceeding with the APA.  Additionally, FTPS will be entitled to reimbursement of its reasonable and actual and documented out-of-pocket fees and expenses incurred by FTPS in conducting its due diligence of the Property, including reasonable attorney fees incurred in connection with the APA and the transactions contemplated thereunder whether incurred prior to and after the Effective Date (the "Expense Reimbursement").   The maximum expense reimbursement that FTPS will be allowed is $50,000.00  In the event that Purchaser is not the successful bidder, the Break-up Fee and Expense Reimbursement shall be paid to Purchaser at Closing.   The Break-Up Fee and Expense Reimbursement will be deemed expenses of administration under Bankruptcy Code § 503.  In the event that the Sale Order is rescinded by the Bankruptcy Court or reversed on appeal, the buyer will be entitled reimbursement of its actual out-of-pocket costs and expenses in conducting its due diligence as an expense of administration entitled to under Bankruptcy Code § 503.

e.      **Compliance with Bidding Procedures.**   Any person wishing to submit a higher or better offer for the Property must do so strictly in accordance with the terms of these Bidding Procedures.

## V.      APPROVAL OF TRANSACTIONS CONTEMPLATED UNDER THE APA

23.      The standard for approval of a sale in bankruptcy cases is the "business judgment" rule and under that standard, the debtor-in-possession has the burden to establish sound business reasons for the terms of the proposed sale. *In re Castre, Inc.*  312 B.R. 426, 428 (Bankr. D. Colo. 2004).

24.      The factors for the Court to consider in whether to approve the sale include (i) whether there exists any improper or bad motive in undertaking the sale transaction; (ii) the fairness of the price and the result of negotiations or bidding at arm's length; and (iii) adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest. *Id.*  In this case, all three factors of the business judgment test are met.

25.      First, no improper motives underlie this transaction.  Since the inception of this case, the Debtor has attempted to position its business in order to effectuate a sale of its assets and related business as a going concern to the extent possible.  Since the petition date, the Debtor has done just that.

26.      Moreover, the Debtor has actively engaged in discussions with all persons who expressed an interest in acquiring its assets and business operations.  Over several months prior

to the Petition Date, Debtor engaged Integris Partners to provide investment banking services to Debtor. These efforts resulted in contact with more than thirty (30) parties, some of which were initially contacted by Raymond James.

27.     Although there were expressions of various levels of interest, with offers being made, Debtor was unable to close any capital raising transactions. In fact, even though Debtor accepted a non-binding offer from a group led by Lee Equity based in New York and proceeded with detailed due diligence and negotiations over several weeks, Debtor was unable to move the Lee Equity offer to closing.

28.     After the termination of the Lee Equity offer in May 2010, Debtor reached back out to Prepaid Solutions, Inc. ("Prepaid Solutions"), which was a logical strategic buyer in that it has a similar business model that markets and sell network branded prepaid debit cards for the payroll and general purpose reloadable card market. After extensive good faith and arm's-length negotiations with Prepaid Solutions, Debtor initially secured both debtor-in-possession and exit financing commitments from Prepaid Solutions. However, at the eleventh hour, this deal fell through.

29.     In connection with this solicitation, Debtor broke its assets into three categories: (1) the processor platform assets (which are the subject of this Motion), (2) the fulfillment assets, and (3) miscellaneous assets. With respect to the processor platform assets, FTPS was the only bidder.

30.     In the Debtor's business judgment, the offer from FTPS represented the highest and best offer particularly since it was the only offer. FTPS is a non-insider, with no affiliation with the Debtor or any of its insiders or affiliates. FTPS and Debtor engaged in arms-length, good faith negotiations resulting in the APA.

31.     Further, the Debtor believes that the Purchase Price to be paid under the APA is fair and reasonable. That statement is based upon the fact that it is the highest offer the Debtor has received to date and is the result of arms' length negotiations between unrelated persons.

32.     The sale under the APA to FTPS is in the best interest of creditors and this estate. It maximizes the value of the Debtor's assets, capturing and preserving going concern value. Additionally,

33.     For these reasons, the sale should be approved and the Debtor authorized to take the steps necessary to consummate the transactions contemplated under the APA.

34.     Under the circumstances, Debtor also request that the fourteen-day stay provided in Fed. R. Bankr. P. 6004(h) be waived.

WHEREFORE, following notice and an opportunity for a hearing, the Debtor respectfully requests that this Court enters an Order:

A.     Granting this Motion;

B.     Approving the APA;

C.   Authorizing Debtor to convey the Property to FTPS free and clear of claims, liens and other interests pursuant to 11 U.S.C. § 363 (b) and (f) and in accordance with the above-referenced APA;

D.   Waiving the fourteen-day stay as provided in Fed. R. Bankr. P. 6004(h), and

E.   Providing such other and further relief as the Court deems appropriate.

Dated: September 2, 2010.

BIEGING SHAPIRO & BURRUS, LLP

By: /s/ Steven T. Mulligan
      Duncan E. Barber, #16768
      Steven T. Mulligan, #19901
4582 S Ulster Street Parkway, Ste. 1650
Denver, Colorado 80237
Telephone: (720) 488-0220
Facsimile: (720) 488-7711
Email: dbarber@bsblawyers.com
Email: smulligan@bsblawyers.com

Counsel for Springbok Services, Inc.

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of September 2, 2010, by and between Fifth Third Processing Solutions LLC, a Delaware limited liability company ("*Purchaser*"), and Springbok Services, Inc., a Delaware corporation ("*Seller*").

<u>Recitals</u>

A.     Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 1101 <u>et seq.</u> (the "*Bankruptcy Code*"), commencing Petition No. 10-25285-HRT in the United States Bankruptcy Court for the District of Colorado (the "*Bankruptcy Court*").

B.     Seller desires to sell the Purchased Assets (as defined below) in accordance with Section 363 of the Bankruptcy Code.

C.     Seller intends to seek approval of the Bankruptcy Court to sell the Purchased Assets to Purchaser free and clear of all liens, claims, encumbrances and interests pursuant to Section 105 and 363 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, and subject to the approval of the Bankruptcy Court, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF ASSETS

1.1.     <u>Purchase of Assets</u>.     Subject to the provisions of this Agreement and in accordance with the Motion and Approval Order (both as defined below), Seller agrees to sell and transfer to Purchaser, and Purchaser agrees to purchase and accept from Seller, on the Closing Date (as defined below), free and clear of all liens, claims, encumbrances and interests of any other person or entity, all right, title and interest in and to the assets of Seller set forth on <u>Schedule A</u> attached hereto (collectively, the "*Purchased Assets*").     Notwithstanding the foregoing, the Purchased Assets shall not include, and Purchaser shall not acquire or assume, any contract or agreement of Seller other than those contracts and agreements set forth on **<u>Schedule 6</u>** to <u>Schedule A</u> (regardless of whether a contract or agreement is listed on any other schedule to <u>Schedule A</u>).

1.2.     <u>No Assumption of Liabilities</u>.     Unless otherwise expressly agreed to in writing, Purchaser shall not be liable or responsible in any way for any liabilities or obligations of, or relating in any way to, Seller or the Purchased Assets, whether fixed or contingent, known or unknown, liquidated or unliquidated, arising now or in the future.     Without limiting the foregoing, Purchaser does not assume, and shall have no obligation or liability for, any liabilities or obligations of Seller relating to any contracts or agreements (other than those contracts and agreements set forth on **<u>Schedule 6</u>** to <u>Schedule A</u>), products, product liability claims, employees, employment matters (including, without limitation, compensation or severance),



employee benefit plans, taxes (including, without limitation, income taxes, withholding taxes with respect to employees, sales or use taxes (except as set forth in Section 7.18), franchise or excise taxes, or real or personal property taxes), litigation, contractual obligations, regulatory or legal compliance or otherwise.

    1.3.   <u>Purchase Price</u>.  The purchase price (the "***Purchase Price***") for the Purchased Assets shall be $1,000,000.00.  The Purchase Price shall be paid as follows:  (1) $125,000.00 (the "Deposit"), by wire transfer to Seller's bankruptcy counsel , and (2) the balance of the Purchase Price shall be paid to Seller on the Closing Date (as defined below) by cashier's check, certified check, or wire transfer, pursuant to written instructions from Seller, of immediately available funds.

    1.4.   <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place at such location as the parties shall mutually agree on the first business day after all closing conditions have been satisfied or waived, as set forth in ARTICLE 5, or at such other time, day, and place as shall be fixed by agreement among the parties (the date of the Closing being herein referred to as the "***Closing Date***").

    1.5.   <u>Deliveries at Closing</u>.

    (a)   Seller agrees to execute and/or deliver or cause to be delivered to Purchaser the following at the Closing:

    (i)   a bill of sale and an assignment (with respect to intellectual property and related intangible assets, and also with respect to assumed agreements), if any, in mutually acceptable forms which shall be effective to transfer, in accordance with the Approval Order, good and marketable title to the Purchased Assets to Purchaser, free and clear of all liens, claims, encumbrances and interests of any kind;

    (ii)   one certified copy of the Approval Order executed and entered by the Bankruptcy Court; and

    (iii)   such other instruments of title, certificates, consents, endorsements, assignment, assumptions and other documents or instruments, in a form reasonably satisfactory to Purchaser and its counsel, as may be reasonably requested by Purchaser in order to confirm that the representations and warranties set forth in Article 2 are true and correct as of the Closing Date, to transfer the Purchased Assets to Purchaser (including assignment documents as may be necessary to file with the United States Patent and Trademark Office), to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

    (b)   Purchaser agrees to deliver or cause to be delivered to Seller the Purchase Price at the Closing payable in accordance with <u>Section 1.3</u> at the Closing by cashier's check, certified check or wire transfer, pursuant to written instructions from Seller.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES
OF SELLER

Seller represents and warrants to Purchaser that the following statements, as of the date hereof and as of the Closing Date, are true and correct.

2.1.    Organization; Authority.  Seller is a corporation duly organized under the laws of the State of Delaware; Seller has all necessary corporate power and authority to own its properties and to carry on its business and to enter into this Agreement and to carry out its obligations hereunder.

2.2.    Title to Purchased Assets.  Seller has good, valid and marketable title to all of the Purchased Assets and none of the Purchased Assets are owned jointly with any other person. Seller has not received written notice contesting its ownership of any Purchased Asset.  The Purchased Assets do not infringe, nor are they alleged to infringe, any patents, trademarks, trade names, service marks, logotypes, designs, copyrights, trade secrets or other intellectual property rights of any other person.

2.3.    Broker.  No broker or finder has acted for Seller in connection with this Agreement and Seller agrees to indemnify and hold harmless Purchaser against any fee, loss or expense arising out of claims by brokers or finders employed or alleged to have been employed by it.

2.4.    Disclaimer.  **EXCEPT AS EXPRESSLY SET FORTH IN WRITING IN THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING SOLD "AS IS," "WHERE IS" AND "WITH ALL FAULTS,' WITH NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE PHYSICAL CONDITION, FAULTS, ENFORCEABILITY OR VALUE OF THE PURCHASED ASSETS AND PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF.  UPON THE CLOSING, PURCHASER SHALL ASSUME ALL RESPONSIBILITY, SHIPPING COSTS, STORAGE COSTS, LIABILITY AND OBLIGATION FOR THE PHYSICAL CONDITION AND STATUS OF THE PURCHASED ASSETS. EXCEPT AS EXPRESSLY SET FORTH IN WRITING IN THIS AGREEMENT, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE WITH REGARD TO THE PURCHASED ASSETS, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH WARRANTIES TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT AS EXPRESSLY SET FORTH IN WRITING IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY AND SHALL HAVE NO LIABILITY WHATSOEVER WITH REGARD TO THE OPERATION, PERFORMANCE, NONPERFORMANCE, QUALITY, AVAILABILITY, COMPLETENESS, ENFORCEABILITY, ACCURACY OR SECURITY OF ANY OF THE PURCHASED ASSETS.**

3

ARTICLE 3
REPRESENTATIONS AND WARRANTIES
OF PURCHASER

Purchaser represents and warrants to Seller that the following statements, as of the date hereof and as of the Closing Date, are true and correct.

3.1.    Organization; Authority.  Purchaser is a limited liability company validly existing and in good standing under the laws of State of Delaware and has the power and authority to enter into this Agreement and to carry out its obligations hereunder.

3.2.    Broker.  No broker or finder has acted for Purchaser in connection with this Agreement and Purchaser agrees to indemnify and hold harmless Seller against any fee, loss or expense arising out of claims by brokers or finders employed or alleged to have been employed by it.

ARTICLE 4
COVENANTS

4.1.    Conduct of Business Pending the Closing.  From the date hereof until the Closing, Seller shall not:

(a)    sell, lease, or transfer any Purchased Asset;

(b)    subject any of the Purchased Assets to any new lien or allow any new lien to exist;

(c)    take any action that would cause any of the representations and warranties made by Seller in this Agreement not to be true and correct in all material respects;

(d)    settle, release or forgive any claim or litigation or waive any right thereto which relates to the Purchased Assets;

(e)    incur any material liabilities related to the Purchased Assets;

(f)    agree to take any action prohibited by this Section 4.1; or

(g)    seek or solicit the sale of the Purchased Assets to any person or entity other than Purchaser.

4.2.    Access.  From the date hereof until the Closing Date, Seller shall allow Purchaser's employees, agents and representatives, during regular business hours, to make such review and investigation of the Purchased Assets and Seller's books and records (including without limitation business, tax and financial records) related to the Purchased Assets as Purchaser reasonably deems necessary or advisable, and the Seller shall instruct its employees, agents and representatives to cooperate in any such investigation.

4

BSB # 130454-2

4.3.   Bankruptcy Procedures.

(a)   Seller shall file a motion (the "*Motion*") seeking the entry of an order (the "*Approval Order*") approving sale of the Purchased Assets to Purchaser free and clear of all liens, claims, encumbrances and interests pursuant to the Bankruptcy Code, subject to offering the Purchased Assets to other potential buyers on the terms and conditions set forth in this Agreement. Seller shall use best efforts to file the Motion on or before September 2, 2010.

(b)   Seller shall use best efforts to provide proper and timely notice of the proposed sale of the Purchased Assets to Purchaser pursuant to this Agreement to all creditors of Seller, including without limitation all developers who created any portion of the Purchased Assets, all third party licensors, and any other party with a known actual or potential claim against any of the Purchased Assets.

(c)   Seller shall also file a motion seeking approval of the following bid procedures:

i.   **Auction.** If no objections are filed opposing these bid procedures, a public auction will be conducted at Debtor's offices at 345 Inverness Drive South, Building A, Suite A-140, on September 14, 2010, commencing at 9:00 a.m., or, in the event that objections are filed, on September 16, 2010, at 9:00 a.m. (the "Auction"). At the Auction, any bid in excess of Purchaser's offer ("Overbid") must be in writing on an executed bid form (a "Bid Form") in substantially the form attached hereto as **Exhibit A**. Each written Overbid submitted to Debtor at the auction will be immediately read aloud to all bidders. The Overbids will be taken in the order submitted to Debtor. Debtor will review all Overbids and will determine if the Overbid meets the minimum requirements for an overbid and is the highest and best bid. Bidding will be in fifteen (15) minute timed increments and shall end if no bids are submitted in a give fifteen minute time period. In the event one or more subsequent qualifying Overbids are made, the last and highest such subsequent qualifying Overbid will be deemed the successful bid (the "Successful Bidder") and Debtor will sign the Bid Form of the Successful Bidder and the Successful Bidder will be deemed the buyer of the Property.

ii.   **Overbids.** Any initial Overbid must be at least $125,000.00 in excess of the Purchase Price. If the Debtor receives Overbids, bids at the Auction must be in increments of $50,000.00 over the preceding Overbid.

A.   Debtor will contact prospective bidders regarding the Auction and will notify these persons that they are required to pre-qualify with Debtor on or before September 10, 2010 (the "Overbid Deadline") by providing information and documentation to Debtor sufficient to demonstrate their financial capacity to close the transactions contemplated in this APA. Purchaser is deemed to be a Qualified Bidder.

B.    In addition to such information, as part of the pre-qualification process, each overbidder must deliver to Debtor by the Overbid Deadline:

1.    An earnest money deposit of $125,000.00 by cashier's check or other immediately available funds made payable to Debtor. Deposits will be nonrefundable if the Bankruptcy Court accepts the bid of such overbidder and such overbidder fails to consummate the transactions contemplated hereby due to such overbidder's default; and

2.    An executed Bid Form that in substance provides that by executing the Bid Form, the proposed overbidder acknowledges that the overbidder has read this APA and agrees (i) to be bound by the terms and conditions of the APA; (ii) that, if the proposed overbidder's bid at the Auction is accepted, the overbidder is obligated to close the purchase transaction on the Closing Date; and (iii) that, if the overbidder fails to timely close the purchase transaction, the overbidder will be in default, the overbidder's earnest money deposit will be forfeited, and Debtor will be free to sell the Purchased Assets to the next highest bidder then willing and able to close

C.    All Overbids (other than overbids made by Purchaser) must (i) provide for a minimum cash deposit of $125,000.00 in the form of a cashier's check or by wire transfer; (ii) provide for a purchase of the Purchased Assets for cash only, to close on or before the Closing Date; (iii) not have conditions to close not present in the APA; and (iv) be submitted in writing by the Overbid Deadline.

iii.    **Break-up Fee and Expense Reimbursement.** In the event that the Successful Bidder is a person other than Purchaser or if the Purchased Assets are acquired in a transaction not contemplated by the APA through no fault of Purchaser, at a closing or consummation of such transaction, Debtor will pay to Purchaser a break-up fee in the amount of $30,000.00 (the "Break-Up Fee") for proceeding with the APA. Additionally, Purchaser will be entitled to reimbursement of its reasonable and actual and documented out-of-pocket fees and expenses incurred by Purchaser in conducting its due diligence of the Purchased Assets, including reasonable attorney fees incurred in connection with the APA and the transactions contemplated thereunder whether incurred prior to and after the Effective Date (the "Expense Reimbursement"). The maximum expense reimbursement that Purchaser will be allowed is $50,000.00. In the event that Purchaser is not the successful bidder, the Break-up Fee and Expense Reimbursement shall be paid to Purchaser at Closing. The Break-Up Fee and Expense Reimbursement will be deemed expenses of administration under Bankruptcy Code § 503. In the event that the Sale Order is rescinded by the

6

Bankruptcy Court or reversed on appeal, the buyer will be entitled reimbursement of its actual out-of-pocket costs and expenses in conducting its due diligence as an expense of administration entitled to under Bankruptcy Code § 503.

iv.     **Compliance with Bidding Procedures.**  Any person wishing to submit a higher or better offer for the Property must do so strictly in accordance with the terms of these Bidding Procedures.

4.4.    <u>Notification of Certain Matters</u>.  Seller shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to the Seller, of (i) any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement and (ii) any written objection, litigation or administrative proceeding that challenges or otherwise objects to the transactions contemplated hereby or the entry of the Approval Order.

4.5.    <u>Seller's Employees</u>.  Purchaser may, but shall have no obligation to, hire any employees of Seller and shall have no liabilities, obligations or responsibilities with respect to any such employees unless Purchaser hires any of such employees and then only to the extent arising from such employees' employment with Purchaser.  No portion of the assets of any plan, fund, program or arrangement, written or unwritten, sponsored or maintained by Seller (and no amount attributable to any such plan, fund, program or arrangement), and no liabilities, obligations or responsibilities with respect thereto, shall be transferred to Purchaser, and Purchaser shall not be required to continue any such plan, fund, program or arrangement after the Closing Date.

ARTICLE 5
<u>CONDITIONS TO OBLIGATIONS</u>

5.1.    <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.  The obligations of Purchaser and Seller to close under this Agreement shall be subject to the satisfaction (or waiver) at or prior to the Closing Date of the following conditions:

(a)     <u>No Injunction</u>.  No preliminary or permanent injunction or other order issued by, and no proceeding or order by or before, any governmental equity in the United States or by any United States governmental entity, nor any law or order promulgated or enacted by any United States governmental entity shall be in effect or pending which materially delays, restrains, enjoins or otherwise prohibits or seeks to restrain, enjoin or otherwise prohibit the transactions contemplated hereby.

(b)     <u>Approval Order</u>.  The Approval Order shall be entered by the Bankruptcy Court.

5.2.    <u>Conditions Precedent to Obligations of Purchaser</u>.  In addition to the satisfaction (or waiver) of the conditions set forth in <u>Section 5.1</u>, the obligations of Purchaser to close under this Agreement shall be subject to the satisfaction (or waiver) at or prior to the Closing Date of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Seller contained herein shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

(b)     Performance of Agreements.  Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing Date.

(c)     Third Party License Fees.  Purchaser shall not be required to pay third party software licensors more than an aggregate of $200,000 for new licenses or transfers of existing licenses in order to use the Purchased Assets following the Closing, excluding the Microsoft Enterprise software.

(d)     Other Deliveries.  Seller shall have delivered such other documents and instruments contemplated by this Agreement.

5.3.    Conditions Precedent to Obligations of Seller.  In addition to the satisfaction (or waiver) of the conditions set forth in Section 5.1, the obligations of Seller to close under this Agreement shall be subject to the satisfaction (or waiver) at or prior to the Closing Date of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Purchaser contained herein shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

(b)     Performance of Agreements.  Purchaser shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing Date.

(c)     Other Deliveries.  Purchaser shall have delivered such other documents and instruments contemplated by this Agreement.

(d)     Payment.  Purchaser shall have delivered to Seller the Purchase Price as set forth in Section 1.3 hereof.

## ARTICLE 6
## TERMINATION

6.1.    This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of Purchaser and Seller.  This Agreement may be terminated at any time after September 17, 2010 but prior to the Closing Date by Purchaser if Seller is unable to obtain the Approval Order by September 17, 2010.  For purposes of this Section, the Approval Order shall be considered obtained with respect to the sale if (a) the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing is pending, or (b) if appeal, review or reargument has been sought, (i) the order has been affirmed or the request for review, or argument has been denied, and the time to seek a further appeal, review or

8

reargument has expired or (ii) a finding has been made pursuant to Section 363(m) of the Bankruptcy Code that the purchase of the Purchased Assets is in good faith and authorization of the sale has not been stayed pending appeal.  If this Agreement is terminated, there shall be no liability or obligation on the part of Seller, Purchaser, or their respective officers, directors, agents and attorneys, and all obligations of the parties hereunder shall terminate.

ARTICLE 7

MISCELLANEOUS PROVISIONS

7.1.  <u>Limitations</u>.  Except as provided in ARTICLE 2, the Purchased Assets are being conveyed hereunder on an "as is, where is" basis, and other than as set forth specifically herein, no party hereto is making, and each party hereto hereby specifically disclaims, any warranties regarding the Purchased Assets, including any implied warranty of merchantability or fitness for a particular purpose.

7.2.  <u>Further Assurances</u>.  At any time and from time to time after the Closing, each party shall execute such additional instruments and take such actions as may be reasonably requested by the other party to transfer clear title to any property transferred hereunder or to otherwise carry out the intent and purposes of this Agreement.

7.3.  <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware and federal bankruptcy laws, including the Bankruptcy Code, as such laws may be applicable.

7.4.  <u>Amendments</u>.  This Agreement may not be amended other than by written instrument signed by each of the parties hereto and approved by the Bankruptcy Court.

7.5.  <u>Entire Agreement</u>.  This Agreement and the agreements referenced herein constitute the sole and only agreements amount the parties hereto respecting the sale and purchase described in this Agreement and set forth the obligations of the parties hereto to each other with respect to such sale and purchase as of their respective dates.

7.6.  <u>Schedules</u>.  All schedules referred to in this Agreement or in any Exhibit or Schedule hereto shall be attached hereto and are incorporated by reference herein.  If any schedules are not complete as of the date of this Agreement, the parties will undertake to complete the schedule at least one business day prior to Closing.

BSB # 130454-2

7.7.   <u>Notices</u>.  Any and all notices or other communications required or permitted by this Agreement or by law to be served on or given to any party hereto by another party to this Agreement shall be in writing and shall be deemed duly served:  (i) upon personal delivery to the party to be notified, or (ii) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written notification of receipt, addressed as follows:

If to Purchaser:

Fifth Third Processing Solutions, Inc.
38 Fountain Square Plaza
8th Floor
Cincinnati, OH 45263
Attention: Adam Coyle, Executive Vice President

with copies to:

Fifth Third Processing Solutions, Inc.
38 Fountain Square Plaza
8th Floor
Cincinnati, OH 45263
Attention: Ned Greene, General Counsel

If to Seller:

Springbok Services, Inc.
345 Inverness Drive South
Building C, Ste. 300
Englewood, CO  80112
Attn: James Skelton

with copies to:

Bieging, Shapiro & Burrus LLP
Duncan E. Barber, Esq.
4582 S. Ulster Street Pkwy., Suite 1650
Denver, CO  80237
Telephone:  720/488-0220
Fax:  720/488-7711
E-mail:  dbarber@bsblawyers.com

or at such other address as one party may designate by notice hereunder to the other parties.

7.8.   <u>Assignment</u>.  Purchaser shall have the right to assign all of its rights and obligations under this Agreement to an affiliate but shall remain liable for all obligations under this Agreement until Closing to the extent such obligations are not fully performed by such affiliate.  Seller may not assign any of its rights or obligations hereunder without obtaining the prior written consent of Purchaser.

10

7.9.   _Binding Agreement_.  This Agreement shall be binding on and shall inure to the benefit of the successors and permitted assigns of the parties hereto.

7.10.   _Headings_.  The section and other headings contained in this Agreement and in the schedules to this Agreement are included for the purpose of convenience reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the exhibits and schedules hereto.

7.11.   _No Third Party Beneficiary_.  None of the provisions herein contained are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party this Agreement.

7.12.   _Counterparts_.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, and a facsimile or other electronic signature of this Agreement shall be deemed an original.

7.13.   _Confidentiality_.  Neither party will disclose to any person any confidential, non-public information related to the other party.

7.14.   _Expenses_.  Each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.  Notwithstanding the foregoing, if either party breaches this Agreement, the breaching party shall be responsible for the costs and expenses, including reasonable attorneys' fees, incurred by the other party attributable to such breach.

7.15.   _Waiver of Trial by Jury_.  SELLER AND PURCHASER HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT, OR IN ANY WAY CONNECTED WITH, OR RELATED TO, OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.   SELLER AND PURCHASER HEREBY AGREE THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY OR PARTIES HERETO TO WAIVER OF ITS OR THEIR RIGHT TO TRIAL BY JURY.

7.16.   _Submission to Jurisdiction; Selection of Forum_.  EACH PARTY HERETO (A) AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN THE BANKRUPTCY COURT, AND (B) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, (C) WAIVES, TO THE EXTENT

BSB # 130454-2

PERMITTED BY APPLICABLE LAW, ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, (D) WAIVES ANY ARGUMENT THAT THE BANKRUPTCY COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY THERETO, AND (E) AGREES THAT SERVICE OR PROCESS UPON ANY PARTY IN ANY SUCH ACTION OR PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH SECTION 7.7 OF THIS AGREEMENT.

7.17.    Severability.    In the event that any provision in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement shall not be in any way impaired, and the illegal, invalid or unenforceable provision shall be fully severed from this Agreement and there shall be automatically added in lieu thereof a provision as similar in terms and intent to such severed provision as may be legal, valid and enforceable.

7.18.    Transfer Taxes.    Any sales or transfer taxes arising from transfer of the Purchased Assets shall be paid by Purchaser.

IN WITNESS WHEREOF, Seller and the Purchaser have caused this Agreement to be duly executed on their behalf as of the date first set forth above.

**Fifth Third Processing Solutions LLC**

By: _____

Name: ADAM P. COYLE

Title: EXECUTIVE VICE PRESIDENT

**Springbok Services, Inc.**

By: _____

Name:

Title:

BSB # 130454-2

PERMITTED BY APPLICABLE LAW, ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, (D) WAIVES ANY ARGUMENT THAT THE BANKRUPTCY COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY THERETO, AND (E) AGREES THAT SERVICE OR PROCESS UPON ANY PARTY IN ANY SUCH ACTION OR PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH SECTION 7.7 OF THIS AGREEMENT.

7.17. <u>Severability</u>. In the event that any provision in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement shall not be in any way impaired, and the illegal, invalid or unenforceable provision shall be fully severed from this Agreement and there shall be automatically added in lieu thereof a provision as similar in terms and intent to such severed provision as may be legal, valid and enforceable.

7.18. <u>Transfer Taxes</u>. Any sales or transfer taxes arising from transfer of the Purchased Assets shall be paid by Purchaser.

IN WITNESS WHEREOF, Seller and the Purchaser have caused this Agreement to be duly executed on their behalf as of the date first set forth above.

**Fifth Third Processing Solutions LLC**

By:_____
Name:
Title:

**Springbok Services, Inc.**

By:_____
Name:  James A. Skelton
Title:  Chief Restructuring Officer

BSB # 130454-2

<u>SCHEDULE A</u>

**Purchased Assets**

The complete software platform through which Seller has managed its prepaid card solutions for customers, including, without limitation, all physical forms and intellectual property rights in the following assets:

- all computer code and software applications owned by Seller listed on **<u>Schedule 1</u>** attached hereto (the "*Seller Software*"), which includes all computer code and software applications of Seller's platform (some software applications of the platform are referred to as Dashboard, Satellite, Processor, ERP and Order Management System);
- all databases which are utilized by the Seller Software or by any third party software application related to the Seller Software but specifically excluding any information relating to Seller's customers or any cardholders that is private in nature and/or subject to privacy policies of Seller's customers or any privacy laws;
- all data contained in the foregoing databases, the Seller Software, or any third party software related to the Seller Software but specifically excluding any information relating to Seller's customers or any cardholders that is private in nature and/or subject to privacy policies of Seller's customers or any privacy laws;
- all modules, interfaces, and components of the Seller Software, including but not limited to any reporting modules and application programming interfaces ("*API*");
- all versions of the Seller Software source code and all media on which such source code resides;
- all hardware and equipment owned by Seller listed on **<u>Schedule 2</u>** attached hereto;
- to the extent that the following exists as of the Closing Date hereof, all physical and electronic documentation relating to the Seller Software and related software and data, including but not limited to any history of development and software revisions, development specifications, development plans, user guides, configuration manuals, programmer notes, and any documentation relating to functional gaps, bugs, errors and defects;
- all registered trademarks and trademark applications listed on **<u>Schedule 4</u>** attached hereto;
- all domain names registered to Seller listed on **<u>Schedule 5</u>** attached hereto;
- an assignment of the confidentiality agreements listed on **<u>Schedule 6</u>** attached hereto; and
- U.S. Patent No. 7,747,462

13

BSB # 130454-2

SCHEDULE 1

1. ERP - Also known as BPWebApp, is the client management platform for establishing new client accounts, placing card orders, reloading cards and overall general management of the client relationship. In addition, this platform is used internally for the functions of Accounting (reconciling client orders, payments, refunds, deposits and balances), cardholder customer service (reviewing balance and transaction history and making adjustments to cards), product setup for Visa/MasterCard and lastly requesting an order be "issued" or "completed" for delivery to the cardholders. (Ref: ERP)

2. Card Generation - This is the system which receives the request to "generate" card numbers and pass them back to the ERP and the Fulfillment System and is a core component of the processing platform. (Ref: Processor)

3. My Card Summary - This system is the cardholder platform allowing them to check their balance, view their transaction history, request their PIN, participate in Bill Pay and other related cardholder specific functions. Additionally, this tool supported "customization" and as such there are over 35 instances of the platform running, one specific to Springbok General Cardholders and 34 other sites which were branded for specific clients and their cardholders. (Ref: ERP)

4. API - This is an "application programming interface" allowing Springbok clients to interface with our ERP and Processing platforms from within their own application, the processing specific portions of this platform will be a part of the processor sale. (Ref: Dashboard, Satellite, Processor, ERP, and Order Management System)

5. Visa/MasterCard Transaction Processing Platform - This system is the transaction processing platform designed to directly connect to MasterCard and to gateway thru STAR for Visa to allow Springbok to function as the issuing processor for ALL of the cards delivered to Cardholders from Key Bank, Meta Bank and Bancorp where Springbok was the program manager of those cards. The platform includes a settlement engine, and rules engine, a fees engine and the real-time processing components required to approve/decline transactions in accordance with the Visa and MasterCard rules and regulations. (Ref: Processor)

6. Cap Labor – CVC's, PINS, Thales

7. CAP Labor – Authorization

8. CAP Labor ACH2Card

9. Cap Labor – Self Select Pins

## SCHEDULE 2 - Owned

| New Asset # | SBS Asset ID | Required | Manufacturer | Hardware Model # | Device S/N | Device Name | General Purpose |
|---|---|---|---|---|---|---|---|
| 003 | | Yes | HP | DL785 G6 | USE952NGAN | P1DBP21 | Database Svr |
| 004 | | Yes | HP | DL785 G6 | USE94BN4S3 | P1DBP22 | Database Svr |
| 007 | 0665 | Yes | HP | DL385 G2 | 2UX74404GL | P1DBF11 | Database Svr |
| 008 | 0873 | Yes | HP | DL385 G2 | 2UX74301VZ | P1DBF12 | Database Svr |
| 009 | 0874 | Yes | HP | DL385 G2 | USE714N0CH | P1DBW11 | Database Svr |
| 010 | 0875 | Yes | HP | DL385 G2 | USE714N0CG | P1DBW12 | Database Svr |
| 011 | 0501 | Yes | HP | DL585 G2 | USE731N8XN | P1SRS01 | Database Svr |
| 012 | 0345 | Yes/PCI | HP | ML570 G4 | USE726N2TH | P1ODB01 | Database Svr |
| 013 | 0892 | Yes | HP | DL385 G2 | 2UX74301V1 | P1DBI01 | Database Svr |
| 014 | 0404 | Yes | HP | DL385 G2 | 910AF9VW802O | P1SWM01 | SW Monitoring Svr |
| 033 | 0242 | Yes | HP | DL360 G5 | | | Domain controller |
| 034 | 0579 | Yes | HP | DL360 G5 | | | Domain controller |
| 035 | 0580 | Yes | HP | DL360 G5 | | | Domain controller |
| 036 | 0691 | Yes | HP | DL360 G5 | | | Domain controller |
| 038 | 0272 | Yes | Thales | HSM 8000 880tps | | P2HSM01 | HSM |
| 039 | 0693 | Yes | Thales | HSM 8000 220tps | | P1HSM02 | HSM |
| 040 | 1005 | Yes | Thales | HSM 8000 220tps | | P1HSM03 | HSM |
| 041 | 0272 | Yes | Thales | HSM 8000 110tps | | T1HSM01 | HSM |
| 042 | 1047 | Yes | Promise | VTRAK M610i | | P1PRM01 | SATA SAN |
| 043 | 1047 | Yes | Promise | VTRAK M610i | | P1PRM01 | SATA SAN |
| 044 | 1047 | Yes | Promise | VTRAK M610i | | P1PRM01 | SATA SAN |
| 045 | 0531 | Yes | Cisco | ASA5520 | | P2FWI01 | Firewall |
| 046 | 0532 | Yes | Cisco | ASA5520 | | P2FWI02 | Firewall |
| 047 | 1164 | Yes | Cisco | ASA5520 | | P2FWE01 | Firewall |
| 048 | 1165 | Yes | Cisco | ASA5520 | | P2FWE02 | Firewall |
| 049 | | Yes | Cisco | ASA5520 | | P1FWI01 | Firewall |
| 050 | | Yes | Cisco | ASA5520 | | P1FWI02 | Firewall |
| 051 | 0692 | Yes | Cisco | PIX15e | | P1FWE01 | Firewall |
| 052 | 0692 | Yes | Cisco | PIX15e | | P1FWE02 | Firewall |
| 053 | 0601 | Yes | Cisco | Cat-4948 | | P2S3C01 | |

| New Asset # | SBS Asset ID | Required | Manufacturer | Hardware Model # | Device S/N | Device Name | General Purpose |
|---|---|---|---|---|---|---|---|
| 054 | 0602 | Yes | Cisco | Cat-4948 | | P253CO2 | |
| 063 | 0145 | Yes | Cisco | Cat-2821 | | | Switch |
| 064 | 0145 | Yes | Cisco | Cat-2821 | | | Switch |
| 065 | 0738 | Yes | Cisco | Cat-3560 | | | Switch |
| 066 | 0738 | Yes | Cisco | Cat-3560 | | | Switch |
| 072 | 1166 | Yes | F5 | BigiP 1600 LTM | | P1LBI01 | Load Balancers |
| 073 | 1166 | Yes | F5 | BigiP 1600 LTM | | P1LBI02 | Load Balancers |
| 074 | | Yes/PCI | RSA | Secure ID | | RSA | Secure Login |
| 075 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 076 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 077 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 078 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 079 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 080 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 081 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 082 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 083 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 084 | | Yes | HP | wx6400 | | EUDT | End User Workstation |
| 085 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 086 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 087 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 088 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 089 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 090 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 091 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 092 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 093 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 094 | | Yes | HP | 6410b | | EULT | End User Laptop |
| 098 | 0743 | Yes/Souce Co | HP | SB5TF501 | | | Source Control |
| 059 | 0405 | Yes | HP | DI-385 | | | BizTalk for Settlement |

**SCHEDULE 3**

Reserved

**Schedule 4**

Registered Trademarks and Trademark Applications

| Trademark | Serial No./ Reg. No. | Filing Date/ Reg. Date | Full Goods/Services |
|---|---|---|---|
| Employee Gift Giving Made Easy<br><br>EMPLOYEE GIFT GIVING MADE EASY | 77/020,524/ 3,281,504 | 10/13/2006 / 08/21/2007 | Client service and cardholder services, namely stored value debit card issuance, debit card transaction processing services and risk management; professional consulting services in the field of stored value debit card issuance, risk management, credit cards and credit |
| PEP<br><br>**PEP** | 77/329,055 | 11/14/2007 | Providing online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, pricing, program management, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services |
| Prepaid Enterprise Platform<br><br>PREPAID ENTERPRISE PLATFORM | 77/329,060 | 11/14/2007 | Providing online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, pricing, program management, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services |
| Springboard<br><br>**SPRINGBOARD** | 77/514,800 | 07/03/2008 | Providing online non-downloadable software for use in prepaid or stored value card issuance, processing, fulfillment, pricing, program management, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in prepaid or stored value card issuance, processing, fulfillment, risk management, client services and cardholder services |
| Ascend<br><br>**ASCEND** | 77/533,479 | 07/29/2008 | Professional financial consulting services in the field of prepaid or stored value card issuance, card transaction processing services and risk management<br><br>Providing a web-based on-line non-downloadable incentive and reward management software platform for ordering and issuing prepaid and stored value cards and processing prepaid and stored value card transactions |
| Springbok<br><br>springbok | 77/548,442 | 08/15/2008 | Client service and cardholder services, namely, stored-value debit card issuance, debit card transaction processing services, and financial risk management; professional financial consulting services in the field of stored value debit card issuance, financial risk management, credit cards and credit |

| Trademark | Serial No./ Reg. No. | Filing Date/ Reg. Date | Full Goods/Services |
|---|---|---|---|
| Springbok  | 77/548,445 | 08/15/2008 | Providing online non-downloadable software for stored-value debit card issuance, processing, fulfillment, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in stored-value debit card issuance, processing, fulfillment, risk management, client services and cardholder services |
| Enpay <br> **ENPAY** | 77/653,888 | 01/21/2009 | Prepaid debit card services, namely, transaction processing services, risk management, cardholder services and client services, namely, responding to balance inquires, providing transaction information and answers to frequently asked questions, providing the means to dispute a transaction and providing responses to budget management questions; financial services, namely, providing payroll card services allowing for online, telephonic and ATM access, management, reporting and record keeping of client accounts; financial services, namely, employer-funded automatic deposit services; ATM banking services, providing cash advances for cardholders at bank branches, and providing cash to cardholders at participating merchant locations; online transfer and bill payment services |
| Enpay  | 77/653,895 | 01/21/2009 | Prepaid debit card services, namely, transaction processing services, risk management, cardholder services and client services, namely, responding to balance inquires, providing transaction information and answers to frequently asked questions, providing the means to dispute a transaction and providing responses to budget management questions; financial services, namely, providing payroll card services allowing for online, telephonic and ATM access, management, reporting and record keeping of client accounts; financial services, namely, employer-funded automatic deposit services; ATM banking services, providing cash advances for cardholders at bank branches, and providing cash to cardholders at participating merchant locations; online transfer and bill payment services |
| Ezspend <br> **EZSPEND** | 77/653,900 | 01/21/2009 | Financial services, namely, providing virtual prepaid debit card services, such virtual cards including an account number, expiration date and online security code, including providing for online and telephonic account access, management, reporting and record keeping |
| Springbok Services  | 78/768,288 / 3,464,161 | 12/07/2005 / 07/08/2008 | Providing online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services |

| Trademark | Serial No./ Reg. No. | Filing Date/ Reg. Date | Full Goods/Services |
|---|---|---|---|
| Springbok Services  | 78/768,436 / 3,410,601 | 12/07/2005 / 04/08/2008 | Client service and cardholder services, namely, stored value debit card issuance, debit card transaction processing services and risk management; professional consulting services in the field of stored value debit card issuance, risk management, credit cards and credit |
| Springbok<br><br>**SPRINGBOK** | 78/768,437 / 3,299,622 | 12/07/2005 / 09/25/2007 | Client service and cardholder services, namely stored value debit card issuance, debit card transaction processing services and risk management; professional consulting services in the field of stored value debit card issuance, risk management, credit cards and credit |
| Springbok<br><br>**SPRINGBOK** | 78/768,438 / 3,299,623 | 12/07/2005 / 09/25/2007 | Providing online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services; technical consultation in the field of online non-downloadable software for use in stored value debit card issuance, processing, fulfillment, risk management, client services and cardholder services |

Domain Name
albuquerquegiftcard.com
anniversarygiftcard.com
atlantagiftcard.com
austingiftcard.com
baltimoregiftcard.com
bestpresentgiftcard.com
bpcprepaid.com
cagiftcard.com
caligiftcard.com
cashfromsupreme.com
charlottegiftcard.com
christmasgiftcard.com
clevelandgiftcard.com
columbusgiftcard.com
corporateincentivesandrewards.com
detroitgiftcard.com
eastcoastgiftcard.com
easyspringbok.com
elpasogiftcard.com
extremegiftgiving.com
formulafuelprogram.com
fortworthgiftcard.com
frontrangegiftcard.com
fuelreliefcard.com
getbehavior.com
graduationgiftcard.com
happybirthdaygift.com
healthreadycard.com
holidaygiftcard.com
houstongiftcard.com
hsacard.net
indianapolisgiftcard.com
ineedspringbok.com
iwantspringbok.com
mastercardgift.com
mcgiftcard.com
mcprepaidcard.com
milwaukeegiftcard.com
minneapolisgiftcard.com
mycbucard.com
mycraftonhillscard.com
mydieselcard.com
myenpay.com
myezspend.com
myezspendsummary.com
mygiftcardsummary.com

mymastercardgiftcard.com
mymcprepaidcard.com
mysamuelmerrittcard.com
mysbvccard.com
myspringbok.com
mystudentfunds.com
mystudyfunds.com
myteamfunds.com
myworkerscompcard.com
orderspringbok.com
philadelphiagiftcard.com
phoenixgiftcard.com
pittsburghgiftcard.com
poweringprepaid.com
prepaidpossible.com
promogiftcard.com
pursu-it.com
qwestcardsummary.com
qwestsummary.com
rebategiftcard.com
rewardgiftcard.com
sacramentogiftcard.com
sanantoniogiftcard.com
sanjosegiftcard.com
springautoincentives.com
springbok.net
springbokcanhelp.com
springbokcardprocessingservices.com
springbokcardservices.com
springbokcps.com
springbokgift.com
springbokgiftshop.com
springbokisengaging.com
springbokpromotions.com
springboktalent.com
springboktoday.com
springbreezy.com
springeager.com
springearly.com
springenergetic.com
springinterest.com
springispersonal.com
springobjective.com
springpast.com
springresult.com
springstrong.com
studentreimbursement.com

thankyougiftcard.com
thebestpresentcompany.com
thebestpresentgiftcard.com
thebok.com
thegiftcard.com
theprepaidgift.com
valentinesgiftcard.com
washingtondcgiftcard.com
weddinggiftcard.com
westcoastgiftcard.com
workerscompcard.com
workerscomppayment.com
wynnsrewards.com
xmasgiftcard.com

Domain Name
BENEFITSACCOUNT.COM
CABLETVBILL.COM
CARDSUMMARY.COM
CHECKMYCARDBALANCE.COM
CONSUMERPREPAID.COM
CORPORATEPREPAID.COM
DENVERGIFTCARD.COM
DIGITALMEDIAACCOUNT.COM
GETMYCARDBALANCE.COM
GOVERNMENTASSISTANCECARD.COM
HEALTHCAREPREPAID.COM
INCENTIVEACCOUNT.COM
INCENTIVEPREPAID.COM
LIGHTRAILCARD.COM
MASTERCARDAWARD.COM
MASTERCARDAWARDCARD.COM
MASTERCARDAWARDS.COM
MASTERCARDINCENTIVE.COM
MASTERCARDINCENTIVECARD.COM
MASTERCARDINCENTIVES.COM
MASTERCARDREWARDCARD.COM
MYACCOUNTSUMMARY.COM
MYALIMONYPAYMENT.COM
MYCAMPUSACCOUNT.COM
MYCARDSUMMARY.COM
MYCELLPHONEBILL.COM
MYCHILDSUPPORTACCOUNT.COM
MYCHILDSUPPORTPAYMENT.COM
MYELECTRICITYBILL.COM
MYEVENTCARD.COM
MYEXPENSEACCOUNT.COM
MYFAMILYCARDS.COM
MYFOODSTAMPS.COM
MYFSACARD.COM
MYGOVPAYMENT.COM
MYHEALTHSAVINGSACCOUNTCARD.COM
MYINSURANCECLAIMCARD.COM
MYMEETINGCARD.COM
MYMONEYTRANSFERCARD.COM
MYPREPAIDBILLS.COM
MYPRESCRIPTIONSAMPLECARD.COM
MYPROJECTCARD.COM
MYRELOCATIONCARD.COM
MYSOCIALSECURITYCARD.COM
MYTRAVELACCOUNT.COM
MYUNEMPLOYMENTCARD.COM

MYUNEMPLOYMENTPAYMENT.COM
MYUTILITYPAYMENT.COM
PAYMENTSIMPLICITY.COM
PAYROLLACCOUNT.COM
PETROLEUMCARD.COM
PREPAIDCONSUMERCARD.COM
PREPAIDCORPORATECARD.COM
PREPAIDINCENTIVECARD.COM
PREPAIDPROMOTION.COM
PREPAIDPROMOTIONCARD.COM
PREPAIDREWARDSCARD.COM
PRESCRIPTIONSAMPLECARD.COM
REBATEACCOUNT.COM
REWARDSPREPAID.COM
SPRINGBOKCARDFULFILLMENT.COM
SPRINGBOKCF.COM
SPRINGBOKCFS.COM
SPRINGBOKCORP.COM
SPRINGBOKFULFILLMENT.COM
SPRINGBOKFULFILLMENTSERVICES.COM
SPRINGBOKPAYMENTSOLUTIONS.COM
SPRINGBOKPREPAID.COM
SPRINGBOKPREPAIDSERVICES.COM
SPRINGBOKPREPAIDSOLUTIONS.COM
SPRINGBOKSERVICES.COM
SPRINGBOKSOLUTIONS.COM
SPRINGBOKSYSTEMS.COM
STATEPAYMENT.COM
TRANSITACCOUNT.COM
UNEMPLOYMENTCARD.COM
UNEMPLOYMENTPAYMENT.COM

## SCHEDULE 6

1. Employee Confidentiality and Inventions Assignment Agreement - Jason Duval
2. Employee Confidentiality and Inventions Assignment Agreement - Jack Unrau
3. Employee Confidentiality and Inventions Assignment Agreement - Neelima Indukuri
4. Employee Confidentiality and Inventions Assignment Agreement - Donald Kaelin
5. Employee Confidentiality and Inventions Assignment Agreement - Daniel Boscia
6. Employee Confidentiality and Inventions Assignment Agreement – Olive Bandy
7. Employee Confidentiality and Inventions Assignment Agreement – Maudy Valencia
8. Employee Confidentiality and Inventions Assignment Agreement - Christe Eldridge

**BID FORM**
*In re Springbok Services, Inc.*, Case No. 10-25285 HRT
Processor Platform Asset Auction

_____, 2010

_____ ("Bidder"), hereby offers to purchase the Property as defined in the Asset Purchase Agreement, dated August __, 2010 ("**APA**"), by and between **SPRINGBOK SERVICES, INC.**, a Delaware corporation, a bankruptcy debtor in the United States Bankruptcy Court for the District of Colorado, Case No. 10-25285 HRT ("**Seller**"), and _____, or Buyer's assigns ("**Buyer**"), for the price of:

$_____

By executing this Bid Form, Bidder acknowledges that Bidder has read the APA and agrees: (i) to be bound by the terms and conditions set forth in the APA; (ii) that, if this bid is accepted, Bidder is obligated to close the purchase transaction with Seller at the offices of Seller's counsel on the Closing Date (as defined in the APA); and (iii) that, if Bidder fails to timely close the purchase transaction as provided herein, Bidder will be in default, Bidder's earnest money will be forfeited and Seller will be free to sell the Property to the next highest bidder then willing and able to close.

BIDDER

By:_____

ACCEPTED AS HIGHEST
AND BEST BID:

SPRINGBOK SERVICES, INC.

By: _____
Name: James A. Skelton
Title: Chief Restructuring Officer

131000