IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Chapter 11 |
| SPRINGBOK SERVICES, INC., <br> EIN: 20-3400089 | Case No. 10-25285-HRT |
| Debtor. | |

**MOTION FOR ORDER APPROVING OVERBID AND AUCTION PROCEDURES INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

Springbok Services, Inc., ("Debtor"), by and through its counsel, Bieging Shapiro & Burrus LLP, pursuant to 11 U.S.C. §§ 105 and 6004, for its Motion for Order Approving Overbid and Auction Procedures Including Break-up Fee and Expense Reimbursement (this "Motion"), Debtor states as follows:

## I. INTRODUCTION

1. On June 18, 2010 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. Debtor continues in possession of its assets as a debtor in possession under 11 U.S.C. §§ 1107 and 1108. An official unsecured creditors' committee was formed on June 29, 2010.

2. Debtor has entered into an Asset Purchase Agreement (the "APA"), with Fifth Third Processing Solutions LLC ("FTPS"). Debtor believes the price provided for in the APA is reasonable and represents fair value for the property to be sold under the APA. By separate motion, Debtor filed its Motion for Order (1) Authorizing the Sale of Certain Assets of Debtor's Bankruptcy Estate, Free and Clear of Liens, Claims, Interests and Encumbrances; and (2) Scheduling a Hearing to Consider Approval of the Sale (the "Sale Motion").

### A. Summary of the APA

3. As more particularly provided in the APA, FTPS will purchase, and the Debtor will sell, substantially all of the Debtor's processing platform assets, including personal property (both tangible and intangible property and property rights) (collectively, the "Property"). The Property that will be sold in this transaction is described as follows:

    a. all computer code and software applications owned by Debtor listed on Schedule 1 attached to the APA (the "Seller Software"), which includes all computer code and software applications of Debtor's platform (some software applications of the platform are referred to as Dashboard, Satellite, Processor, ERP and Order Management System);

    b. all databases which are utilized by the Seller Software or by any third party software application related to the Seller Software but specifically excluding any

information relating to Debtor's customers or any cardholders that is private in nature and/or subject to privacy policies of Debtor's customers or any privacy laws;

    c.    all data contained in the foregoing databases, the Seller Software, or any third party software related to the Seller Software but specifically excluding any information relating to Debtor's customers or any cardholders that is private in nature and/or subject to privacy policies of Debtor's customers or any privacy laws;

    d.    all modules, interfaces, and components of the Seller Software, including but not limited to any reporting modules and application programming interfaces ("API");

    e.    all versions of the Seller Software source code and all media on which such source code resides;

    f.    all hardware and equipment owned by Debtor listed on Schedule 2 attached to the APA;

    g.    to the extent that the following exists as of the Closing Date hereof, all physical and electronic documentation relating to the Seller Software and related software and data, including but not limited to any history of development and software revisions, development specifications, development plans, user guides, configuration manuals, programmer notes, and any documentation relating to functional gaps, bugs, errors and defects;

    h.    all registered trademarks and trademark applications listed on Schedule 4 attached to the APA;

    i.    all domain names registered to Debtor listed on Schedule 5 attached to the APA;

    j.    an assignment of the confidentiality agreements listed on Schedule 6 attached to the APA; and

    k.    U.S. Patent No. 7,747,462.

4.    FTPS has agreed to pay $1,000,000.00 for the Property (the "Purchase Price") paid as follows: (1) $125,000.00 (the "Deposit"), by wire transfer to Debtor's bankruptcy counsel, and (2) Purchaser shall pay the balance of the Purchase Price shall be paid to Debtor on the Closing Date (as defined below) by cashier's check, certified check, or wire transfer, pursuant to written instructions from Debtor, of immediately available funds..

5.    The sale is conditioned on various events, including the following:

    a.    Delivery by Debtor to FTPS of certain due diligence materials;

    b.    Delivery by Debtor of appropriate documents conveying the Property; and

    c.    Bankruptcy Court approval of the APA and sale to FTPS by September 17, 2010;

        d.    The continued accuracy of the representations and warranties of the Debtor in the APA;

        e.    Debtor's performance in all material respects of all obligations and agreements in the APA; and

        f.    FTPS not being required to pay third party licensors more than an aggregate of $200,000 for new software licenses in order to use the Property, excluding Microsoft Enterprise software.

    6.    As set forth in the APA, the closing of the sale is to occur five business days after the Sale Hearing unless the parties mutually agree to extend the closing date (the "Closing Date").

## B. Overbid and Auction Terms and Procedures

    7.    The APA is also conditioned upon the entry of an order by the Bankruptcy Court approving certain sale and bidding procedures (the "Bid Procedures Order"). The Bid Procedures are summarized as follows:

        a.    **Auction.** If no objections are filed opposing these bid procedures, a public auction will be conducted at the offices of Debtor's offices at 345 Inverness Drive South, Building A, Suite A-140 on September 14, 2010, commencing at 9:00 a.m., or, in the event that objections are filed, on September 16, 2010, at 9:00 a.m. (the "Auction"). At the Auction, any bid in excess of FTPS' offer ("Overbid") must be in writing on an executed bid form (a "Bid Form") in substantially the form attached hereto as **Exhibit A**. Each written Overbid submitted to Debtor at the auction will be immediately read aloud to all bidders. The Overbids will be taken in the order submitted to Debtor. Debtor will review all Overbids and will determine if the Overbid meets the minimum requirements for an overbid and is the highest and best bid. Bidding will be in fifteen (15) minute timed increments and shall end if no bids are submitted in a give fifteen minute time period. In the event one or more subsequent qualifying Overbids are made, the last and highest such subsequent qualifying Overbid will be deemed the successful bid (the "Successful Bidder") and Debtor will sign the Bid Form of the Successful Bidder and the Successful Bidder will be deemed the buyer of the Property.

        b.    **Overbids.** Any initial Overbid must be at least $125,000.00 in excess of the Purchase Price. If the Debtor receives Overbids, bids at the Auction must be in increments of $50,000.00 over the preceding Overbid.

            i.    Debtor will contact prospective bidders regarding the Auction and will notify these persons that they are required to pre-qualify with Debtor on or before September 10, 2010 (the "Overbid Deadline") by providing information and documentation to Debtor sufficient to demonstrate their financial capacity to close the transactions contemplated in this APA. FTPS is deemed to be a Qualified Bidder.

            ii.    In addition to such information, as part of the pre-qualification process, each overbidder must deliver to Debtor by the Overbid Deadline:

        A.    An earnest money deposit of $125,000.00 by cashier's check or other immediately available funds made payable to Debtor. Deposits will be nonrefundable if the Bankruptcy Court accepts the bid of such overbidder and such overbidder fails to consummate the transactions contemplated hereby due to such overbidder's default; and

        B.    An executed Bid Form that in substance provides that by executing the Bid Form, the proposed overbidder acknowledges that the overbidder has read this APA and agrees (i) to be bound by the terms and conditions of the APA; (ii) that, if the proposed overbidder's bid at the Auction is accepted, the overbidder is obligated to close the purchase transaction on the Closing Date; and (iii) that, if the overbidder fails to timely close the purchase transaction, the overbidder will be in default, the overbidder's earnest money deposit will be forfeited, and Debtor will be free to sell the Property to the next highest bidder then willing and able to close

    c.    All Overbids (other than overbids made by FTPS) must (i) provide for a minimum cash deposit of $125,000.00 in the form of a cashier's check; (ii) provide for a purchase of the Property for cash only, to close on or before the Closing Date; (iii) not have conditions to close not present in the APA; and (iv) be submitted in writing by the Overbid Deadline.

    d.    **Break-up Fee and Expense Reimbursement.**  In the event that the Successful Bidder is a person other than FTPS or if the Property is acquired in a transaction not contemplated by the APA through no fault of FTPS, at a closing or consummation of such transaction, Debtor will pay to FTPS a break-up fee in the amount of $30,000.00 (the "Break-Up Fee") for proceeding with the APA. Additionally, FTPS will be entitled to reimbursement of its reasonable and actual and documented out-of-pocket fees and expenses incurred by FTPS in conducting its due diligence of the Property, including reasonable attorney fees incurred in connection with the APA and the transactions contemplated thereunder whether incurred prior to and after the Effective Date (the "Expense Reimbursement"). The maximum expense reimbursement that FTPS will be allowed is $50,000.00 In the event that Purchaser is not the successful bidder, the Break-up Fee and Expense Reimbursement shall be paid to Purchaser at Closing. The Break-Up Fee and Expense Reimbursement will be deemed expenses of administration under Bankruptcy Code § 503. In the event that the Sale Order is rescinded by the Bankruptcy Court or reversed on appeal, the buyer will be entitled reimbursement of its actual out-of-pocket costs and expenses in conducting its due diligence as an expense of administration entitled to under Bankruptcy Code § 503.

    e.    **Compliance with Bidding Procedures.**  Any person wishing to submit a higher or better offer for the Property must do so strictly in accordance with the terms of these Bidding Procedures.

**C.**    **Legal Authority for Auction and Bid Procedures**

8. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provision of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Bankruptcy courts are given a great deal of discretion when deciding whether to authorize a sale of assets outside the ordinary course of business. *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2nd Cir. 1992).

9. The proper standard the Court's use in considering a proposed motion to sell is the "business judgment" test and under that standard, the debtor-in-possession has the burden to establish sound business reasons for the terms of the proposed sale. *In re Castre, Inc.* 312 B.R. 426, 428 (Bankr. D. Colo. 2004). In addressing this test, the Debtor bears the burden of proof in the business judgment test, evaluated by the Court under the following factors: (1) any improper or bad motive; (2) whether the price is fair and the negotiations or bidding occurred at arm's length; and (3) the use of adequate procedures, including proper exposure to the market and accurate and reasonable notice to parties in interest. *Id. See also, In re Jillian's Entertainment Holdings*, 327 B.R. 616 (Bankr. W.D.Ky. 2005) (using the Lionel business judgment test and the three factors to find an auction rather than a two-party sale would better fulfill the goal of maximizing return to the estate).

10. Further, the business judgment must be evaluated as to (a) the propriety of the sale motion and a "stalking horse" bid; (b) the preparation for and conduct of the auction; and (c) the highest and best bid received. *Id.* (citing *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497 (Bankr. N.D. Ala. 2002)).

11. As discussed in the Sale Motion, in this case, all three factors of the business judgment test as refined as per *In re Gulf States Steel, Inc. of Alabama* are met.

12. Sellers of assets often employ bidding protections in order to encourage the making of bids. A break-up fee is a fee paid by a seller to a potential acquirer of assets in the event the transaction is not consummated or certain conditions in the APA are not met. Break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets." *The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992); *See also In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992).

13. Outside the bankruptcy context, courts commonly approve break-up fees. Such fees are presumptively appropriate under the business judgment rule, and non-bankruptcy courts rarely rule on their propriety. *See Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988), *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 440 (Bankr. S.D.N.Y. 1988).

14. Similarly, bankruptcy courts generally presume that the board's decision to agree to a break-up fee was a valid exercise of its business judgment. *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y 1992). In reviewing the bankruptcy court's decision, the District Court held in *In re Integrated Resources, Inc.*, that three issues must be considered by a bankruptcy court in assessing bidding protections such as break-up fees: "(1) is the relationship

of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (2) does the fee hamper, rather than encourage, bidding [and] (3) is the amount the fee unreasonable relative to the proposed purchase price?" *In re Integrated Resources, Inc.*, 135 B.R. at 657.

15. The District Court added that a break-up fee may serve one of three functions: "to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

16. Bankruptcy courts will generally authorize bidding protections such as expense reimbursement or break-up fees where such bidding protections enhance rather than deter bidding. *See, e.g.. In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. at 28. One such situation is where the bidder is a "stalking horse" -- an initial interested party that promotes competition and encourages other bidders to come forward by submitting a binding offer and providing a baseline against which higher or otherwise better offers can be measured. *In re Integrated Resources, Inc.*, 135 B.R. at 250.

17. In the case, FTPS should be entitled to the Break-up Fee and the Expense Reimbursement. It is the party which spent substantial time, resources and out-of-pocket expenditures to investigate the Property and negotiate a transaction which Debtor has ultimately agreed to and which will serve as the baseline for other competing bids. Additionally, at the contemplated auction, the bidding protections described above were reasonably calculated to encourage FTPS to submit a final bid within the upper range of reasonably anticipated values and which will also serve as a baseline against which higher and better offers can be measured.

18. A tremendous amount of time has been expended by the parties in preparing the APA and its schedules. In doing so, many agreements and other documents were reviewed for continuing effect to the Property. Additional time will be expended hereafter in finalizing this transaction for closing.

19. In addition, the bidding protections proposed are "reasonably related to the bidder's efforts and the transaction's magnitude." *Integrated Resources, Inc.*, 147 B.R. at 662-63. The Break-Up Fee represents approximately three and one-third percent (3.3%) of the Purchase Price. Moreover, the amount payable from the estate will be directly "related to the bidder's efforts." *Id.* In comparison to bidding incentives approved in other cases, this request for a break-up fee and expense reimbursements is not unreasonable. *See Integrated Resources*, 147 B.R. at 662 (break-up fee representing .3 to 3.1% of transaction amount plus reimbursement of expenses upheld; expert testified that outside of bankruptcy break-up fees average 3.3%); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (fee of 1.1% upheld); *see also In re Mobile Media Communications, Inc.*, 97-174 (PJW) (Bankr. D.Del) (fees of 2.9% and 3.2% upheld). *See also In re CSI Enterprises, Inc. et al.*, No. 95-11642 (CEM) (Bankr. D. Colo. October 22, 1996) (approving 2.4% break-up fee); *In re Dreiling*, No. 89-14175, (SBB) (Bankr. D, Colo. July 14, 1999) (approving 3% break-up fee).

20. Under these circumstances, the Court should not override Debtor's business judgment. The bidding procedures that have been agreement upon will encourage bidding and help to maximize the value of Debtor's assets. Additionally, the bidding procedures are reasonable in relation to the efforts expended by and to be expended by FTPS and the

significance of the proposed transaction. Accordingly, the Court should approve the proposed bidding procedures.

WHEREFORE, Debtor requests that this Court enter an Order:

A. Granting this Motion;

B. Approving the overbid procedures and break-up fee and expense reimbursement as described in the Motion; and

C. Providing such other and further relief as the Court deems appropriate.

Dated: September 2, 2010.

        BIEGING SHAPIRO & BURRUS, LLP

        By: /s/ Steven T. Mulligan
            Duncan E. Barber, #16768
            Steven T. Mulligan, #19901
        4582 S Ulster Street Parkway, Ste. 1650
        Denver, Colorado 80237
        Telephone: (720) 488-0220
        Facsimile: (720) 488-7711
        Email: dbarber@bsblawyers.com
        Email: smulligan@bsblawyers.com

        Counsel for Springbok Services, Inc.

EXHIBIT A

**BID FORM**
*In re Springbok Services, Inc.,* **Case No. 10-25285 HRT**
**Processor Platform Asset Auction**

_____, 2010

_____ ("Bidder"), hereby offers to purchase the Property as defined in the Asset Purchase Agreement, dated August \_\_, 2010 ("**APA**"), by and between **SPRINGBOK SERVICES, INC.**, a Delaware corporation, a bankruptcy debtor in the United States Bankruptcy Court for the District of Colorado, Case No. 10-25285 HRT ("**Seller**"), and _____, or Buyer's assigns ("**Buyer**"), for the price of:

$_____

By executing this Bid Form, Bidder acknowledges that Bidder has read the APA and agrees: (i) to be bound by the terms and conditions set forth in the APA; (ii) that, if this bid is accepted, Bidder is obligated to close the purchase transaction with Seller at the offices of Seller's counsel on the Closing Date (as defined in the APA); and (iii) that, if Bidder fails to timely close the purchase transaction as provided herein, Bidder will be in default, Bidder's earnest money will be forfeited and Seller will be free to sell the Property to the next highest bidder then willing and able to close.

BIDDER

By:_____

ACCEPTED AS HIGHEST
AND BEST BID:

SPRINGBOK SERVICES, INC.

By: _____
Name: James A. Skelton
Title: Chief Restructuring Officer

131000